## HANNIBAL G. COBURN v. THE MUSKEGON BOOMING COMPANY.

*Logs and logging—Booming companies—Negligence—Evidence—Damages—Interest.*

1. Under the statute providing for the organization of log-running and booming companies, the corporation has the right on the streams where it can lawfully do business to construct, use, and maintain all necessary booms for that purpose, the location, extent, manner of construction, and number of which is left to its own determination, subject to the statutory restriction that, so far as practicable, they must be constructed and used in such a manner as to allow the free passage of boats, vessels, crafts, logs, lumber, timber, or other floatables along the stream.

2. In a case involving the question of whether a booming company properly managed its business of log driving during a given season, a witness who is shown competent to testify on the subject may aid the jury by giving his opinion whether the work was properly done or not.

3. In a suit against a booming company for obstructing a river, and thereby preventing the plaintiff from putting his logs into the river by July 1 of a given year, as he had contracted to do, the manner in which he did his job, or at what time he did it, whether within the contract or not, is no concern of the defendant, and could have no effect, by way of excuse or otherwise, for any obstruction to the right of passage to plaintiff's logs down the stream.

4. A question giving the contents of a paper which a witness is being interrogated about, and which is not introduced in evidence, is incompetent.

5. The requests to charge of defendant, set forth in the opinion, are held to have been properly refused, for reasons therein stated.

6. Interest cannot be allowed upon a claim for expenses paid, as claimed, by reason of the wrongful act of the defendant, the existence of which claim is only determinable by the verdict.

Error to Montcalm. (Smith, J.) Argued June 29, 1888. Decided October 26, 1888.

Case. Defendant brings error. Reversed. The facts are stated in the opinion.

*Edwin F. Uhl,* for appellant, contended:

1. The court erred in refusing defendant's first request (see opinion), which is based upon a variance between the allegation and proof, in this, that the declaration charges the defendant with malfeasance, while the proof tends to show negligence merely, if anything; citing *Macumber v. Booming Co.,* 52 Mich. 195.

2. The right of defendant to run logs, and that of plaintiff to put them in, are concurrent, and each is to be exercised without negligence; citing *Booming Co. v. Nelson,* 45 Mich. 583.

3. Interest is not allowable as damages if there is no final understanding as to how much is to be paid; citing *Railway Co. v. People,* 46 Mich. 193; *McCreery v. Green,* 38 Id. 185; *Davis v. Walker,* 18 Id. 25; and the general rule is that interest is not to be allowed on unliquidated damages; citing 1 Suth. Dam. 610; and see *Lucas v. Wattles,* 49 Mich. 383.

4. The opinion of Mr. Moon, as to the manner of handling logs by the defendant in 1882, ought to have been received. He was a man of large experience on the river, and well qualified to speak intelligently on the subject; citing *Enright v. Hartsig,* 46 Mich. 469.

*William E. Hoyt (J. C. Fitz Gerald, F. A. Stace,* and *Charles Chandler,* of counsel), for plaintiff, contended:

1. The competency of a witness as an expert is for the court to find; citing *McEwen v. Bigelow,* 40 Mich. 215, 217.

2. There was evidence of loss of time by plaintiff's men sufficiently certain to form a basis for the allowance of damages; citing *Booming Co. v. Nelson,* 45 Mich. 583; *Heiser v. Loomis,* 47 Id. 19; *Gilbert v. Kennedy,* 22 Id. 130; and the court properly declined to take this question from the jury; citing *Doyle v. Mizner,* 40 Mich. 160, 164; *Teipel v. Hilsendegen,* 44 Id. 461, 462; *Demill v. Moffat,* 45 Id. 410.

2. While interest could not be demanded, it was right and just that it should be given, and its allowance was not error; citing *Kendrick v. Towle,* 60 Mich. 368; *Lucas v. Wattles,* 49 Id. 383; *Snow v. Nowlin,* 43 Id. 387; *Cook v. Perry,* Id. 628.

SHERWOOD, C. J.    This action was brought in the circuit court for the county of Montcalm to recover damages which plaintiff alleges he has sustained in consequence of the defendant having prevented the free passage of logs down the Big Muskegon river, by putting in and maintaining a boom across the river, and causing a jam, and preventing the plaintiff from putting into the river logs which he had contracted to deliver afloat therein before July 1, 1882.

The record shows that October 10, 1881, the plaintiff entered into an agreement with R. H. Roys & Co., of the city of Greenville, whereby he was to cut, haul, and put afloat in the Big Muskegon river on or before the 1st day of July, 1882, all the pine timber on 400 acres in Mecosta county, for which services Roys & Co. were to pay him $500 in advance, and $1 for each thousand feet cut and skidded each month, and $1.50 additional for each thousand feet banked on the river, and the balance of the contract price when all the logs should be afloat.    Roys & Co. also agreed to procure for plaintiff the right of way for tram-roads and other roads from the timber to the Big Muskegon river, a distance of about three miles,

and also the right of rollways for putting the logs into the river, neither Coburn nor Roys & Co. owning the bank. The plaintiff commenced building the roads in December, and finished them in April.

The defendant is a corporation organized under the statutes of Michigan for the purpose of running, driving, booming, and rafting logs on any streams or waters in this State. The statute gives it power to acquire and hold such real estate and personal property as is necessary for the purpose of carrying on business. It may make contracts with parties for running, booming, and rafting logs.

The statute[1] contains the following clause:

"*And provided, further*, that such boom or booms shall be so constructed, and, so far as practicable, used, as to allow the free passage of boats, vessels, crafts, logs, timber, lumber, or other floatables along such highways."[2]

Under the charter of this company defendant had the power and right on the streams where it could lawfully do business to construct, use, and maintain all necessary booms for its business. Their location, extent, manner of construction, and number is left to its own determination, subject only to the restrictions above mentioned.

The record further shows that during the year 1882 the defendant was engaged in the business of running, driving, and booming saw-logs and other timber on the Big Muskegon river and its branches, and delivering the same to the owners thereof where required at points in and

[1] How. Stat. § 3917, gives such corporations the power and the right in any of the *navigable* waters of this State, named in their articles of association, to construct, use, and maintain all necessary booms for their business, *Provided always*, that they shall first have obtained from the owner or owners of the shores along which or in front of which they desire to construct such boom or booms, either by lien or purchase, their permission so to do, and subject, also, to the proviso set forth in the opinion.

[2] By Act No. 80, Laws of 1883, this provision is amended so as to read "such boom or booms shall, so far as practicable, be so constructed and used," etc.

around Muskegon lake, at the mouth of the river, and into which it flows, and for that purpose the defendant, as such corporation, assumed control of all the logs put afloat on the river during the year, including those put in by the plaintiff, and undertook to run and drive them down the river in due season.

It further appears that during that year the defendant maintained at different points in the river spiles and piers, at which it could place booms across the stream, and stop the passage of logs. Among others in its course down stream defendant maintained these spiles near Croton, a short distance above the junction of the Little and Big Muskegon rivers, and at which point the river was between 300 and 400 feet wide; also the Orton piers, about 10 miles below the Croton spiles; also the Newaygo piers, about 5 miles below the Orton; and then came the Sand Creek piers, near the lake, and below which were the sorting grounds of the company.

It further appears from the record that the plaintiff, for the purpose of filling his contract in putting the logs afloat, rented a tract of land on the bank of the river, suitable for rollway purposes, and about 12 miles on the river above the Croton spiles, and constructed a tramway from the land containing the timber to the rollway, procured cars, employed men and teams, and commenced to cut, haul, and put afloat the logs from the land under his agreement with Roys & Co.; that his rollway was constructed along the bank of the river where the bank was very high, being about 100 feet down to the edge of the river, and in such manner that but one man was required to keep the rollway clear of logs as they were unloaded; that the defendant used its boom at Sand Creek to regulate the passage of logs down to the sorting grounds, and which was frequently used to keep the logs back until those that had passed the boom could be properly assorted

by the men below. The plaintiff claims as his griev-
ance—.

"That shortly after the opening of the log-driving sea-
son in 1882 (the defendant having control of and running
all the logs put into the river from Houghton lake to
Muskegon lake, and being engaged in the usual manner
in running logs down the entire length of the river) a
difficulty occurred at the assorting grounds near Muskegon
lake, and the men there in the employ of the defendant
quit work, and refused to work longer for the defendant
except on certain terms and rates of wages to which
defendant was not willing to accede; whereupon the
defendant, notwithstanding the fact that the river was
then well stocked with logs coming down steadily from
the various rollways along its banks, under the control of
the defendant, during the month of April, 1882, refused to
hire and employ men at its sorting grounds, and stopped
work thereat, and refused to allow any logs whatever to pass
the boom at Sand Creek, and for the purpose of stopping
the logs, and holding them in the river, defendant
stretched a boom across the river at the Orton piers, and
stretched another across the river at the Croton spiles, all
in the month of April, and while logs were being rapidly
run down the stream from above by the defendant.

"These booms were so placed for the express purpose
of stopping the logs. The effect of placing these booms
across the stream was to stop the passage of the logs
entirely. The boom at the Orton piers arrested all that
had passed the Croton spiles, and all that came from the
Little Muskegon and other tributaries below the Croton
spiles, as well as those put in the river between it and
Croton, forming a stationary jam from the Orton piers up
stream to within about two miles of Croton. The boom
at the Croton spiles stopped all the logs then passing
down the stream, causing a jam, and the defendant con-
tinued, after placing this boom, to run and drive logs
from above steadily down until stopped by the boom. In
consequence a solid stationary jam of logs was formed,
extending from bank to bank of the river, and several
logs deep, which rapidly set back many miles, extending
up stream to, and for several miles beyond, the plaintiff's
rollways, filling the river with a compact mass of logs
from bank to bank, and several logs in depth, for the
entire distance.

"And during the time from the placing of the boom until the latter part of July the defendant suspended operations as to running and driving logs, except to run logs from above into the jam above the Croton spiles, and discharged its men, save enough to preserve the booms intact, so that logs could not pass. Instructions were given to the defendant's employés at these several booms to maintain them, and not to permit logs to pass them, at all hazards, and by force, if necessary; and the defendant did maintain these booms, and the jams so formed, wrongfully and by force, and without doing anything itself towards the driving and running of logs in the river (except running logs from above into the jam formed by the Croton spiles boom), and preventing any other person from running or driving logs from sometime in April, when the booms were first placed, until the latter end of July, when it to some extent resumed its sorting works, during which time the boom was not opened, save for a day or so, about the beginning of July, to allow the floating boarding shanties of the defendant to pass.

"The defendant, during the last few days of July, and in August, September, and October, had a small force of men at work on this jam above the Croton spiles, and commenced to 'pull' the jam July 25, and from that time the jam was moved from time to time, at intervals, moving when it moved bodily, *en masse*, and continuing in motion for periods varying from half an hour to several hours each; but the jam remained substantially unbroken until late in October of that year.

"At the time that this jam above the Croton spiles was formed and became extended up to the plaintiff's rollways the plaintiff still had the greater part of his logs to put in. The effect of this jam was to prevent the logs from floating off away from the plaintiff's rollways, by the natural flow of the water, and plaintiff was thereby compelled, as the best thing he could do under the circumstances, to bank and deck the logs on his rollway until it was filled, and then to form other rollways along the bank of the river, and extend his tramway thereto, and fill them, to be ready to put his logs afloat when the jam should be broken and moved out.

"All this caused great additional expense by the extension of the tram-road and formation of new rollways, and requiring five or six men and teams to unload the logs, and deck them up on the rollways, instead of the one

man required when there was no jam, besides great expense in loss of time by men and teams lying idle in consequence of hindrances at the rollways by reason of the jam, and very great expense incurred in breaking rollways; and plaintiff was unable to get all his logs into the river that fall, a very large quantity being unavoidably left over until the following spring, whereas, had this jam not been formed and maintained, he would have been able, at a comparatively small expense, to have completed his job in one season."

And by reason of the said several premises the plaintiff avers he has sustained $10,000 damages.

The defendant claims the testimony shows that the case is one where all the loggers in the vicinity of the river, from its source to its mouth, were striving each to put in his own logs, and place the same under the custody of the defendant, who was the common agent of them all, without any regard to any inconvenience to the other log-owners or to the defendant, the defendant not having any control over any of the owners; that all put in these logs when they wanted to or could, and did so without any regard to any other owner, and without any regard to the capacity of the stream, or the ability of the defendant to drive such an excessive quantity; that all that could be required of the defendant under such circumstances was to do the best it could with such reasonable force as was at its command to drive the logs, and that this the defendant did, having due regard to the property of each.

That, to the extent that this required the delaying of some logs, whosever they might be, it was justified, and no matter whether such logs were afloat or ready to put afloat; that simply showing that the defendant might possibly have freed the river of logs in front of the plaintiff's rollways, for a time, in some manner, was not sufficient evidence of negligence on the part of the defendant to make it liable, as the common interest of all the log-owners was involved, and it may have required that the

drive should be held back; that it is neither law nor justice to hold the defendant liable for all the hindrances and delays the log-owners have caused one another; and that it would be equally unjust to make defendant pay damages to one who has suffered injury, if such injury resulted from reasonably good management in behalf of all interested, or from his own neglect or tardiness.

The defendant also further claims that the plaintiff did not avail himself of his opportunities to put his logs into the river; that there was open water in the river before the middle of April in 1882, and that then for the first time the plaintiff began unloading his tram cars of logs, which floated off freely with the current, and so continued until after June 1 of that year; that logs of the owners did not come down from above till sometime after June 1, and then for several months the river was full of logs·coming from above, until the drive got past; that the plaintiff, having neglected to put in his logs in advance of the drive, was obliged to take his chances in getting his logs into it; that six months of plaintiff's contract time for putting in his logs had then already elapsed, and that he had two months after the 15th of April, when the river was open, for putting in his logs from the rollways, and failed to do it, and had but one month under his contract when the logs put in by others came down and filled the river full, compelling him to then wait until the rear of the drive had passed.

Defendant further claims that during all this time it did all that it could, and all that could be done, to hasten the drive down the river, having proper regard for all parties interested; that the plaintiff did not manage his rollways properly after the drive was abreast of them; that he piled up 4,000,000 feet of logs on his rollways, and continued to roll them on until the piles were 100 or 125 feet deep, and then he employed but three or four men

to break the rollways into the drive, and that his entire management of his logs was improper, and not calculated to hasten their passage down the river, and that the delay, if any, was largely attributable to these causes, and not to the negligent acts of the defendant.

The foregoing is a full statement of the theories of the respective parties, and the facts upon which the plaintiff bases his cause of action, and the defendant's counsel claims a defense.

Upon these theories the cause was tried by the respective counsel, and by the court submitted to the jury.

The verdict was for the plaintiff for the sum of $3,012.40.

The defendant asks a review of the case in this Court.

The record is very full, and a large number of exceptions were taken upon the trial. Those relating to the testimony will be first considered. Several were abandoned on the hearing. We have examined all the others as they stand in the record. Only those, however, will be herein noticed which were argued by counsel at the hearing.

We do not think the first five exceptions as they appear in the defendant's brief are well taken. They relate to the damage sustained in consequence of the alleged unlawful obstruction maintained in the river by the defendant, and the testimony all had a material bearing upon the amount of damages the plaintiff sustained. We think it was competent to make the proof he offered under his theory of the case.

The defendant called and examined as a witness R. A. Moon, and asked him the following question:

"What can you say as to whether the boom company handled the logs in the river as well as they could have been handled?"

Counsel for plaintiff objected to the question "as incompetent, irrelevant, and leading;" also, that "the

witness has not shown himself competent to give an
opinion."

Before this the witness had testified that in 1882 he
logged on Muskegon river.

"Put in that year between 25,000,000 and 30,000,000
feet. Put some of them in every month of the year,
working steady the year round. Don't remember the sec-
tion the logs were on in Newaygo county, about seven
miles by land above Croton. * * * I worked from
January, 1880. I worked five years right along in suc-
cession. * * * From April, 1882, to July, 1882, I put
in about 2,000,000 feet a month."

Then the above question was put, and the objection was
sustained. The witness further testified:

" Q. State as far as you know, so far as your observa-
tion went, in what manner the boom company handled
the logs of that year.

" A. Well, all I saw was driving, men starting the jam
on the river, when they hauled them from below along
by my rollways, and different places along the river. *
* * When I saw the river it was full.

" Q. So far as your observation of the river went, and
the operation of the boom company on these logs, state
whether it was properly done or otherwise."

This was objected to by plaintiff's counsel, upon the
ground that the witness has not testified to his familiar-
ity.

" By the Court. I guess he need not answer. He has
not stated very much knowledge about what was done.

" Q. For how many years have you put logs into the
Muskegon river?

" A. I quit in the fall of 1882. Well, it was about 27
years.

" Q. You never had anything to do with driving the
river, did you?

" A. Not the main river; no, sir. Oh, yes, I drove 20
or 30 miles of it to Big Rapids; * * * that is, not
connected with any others besides my own,—just my own
logs. I have driven side streams some.

" Q. So you have had experience in log-driving?

" *A.* Yes, on side streams.

" *By Defendant's Counsel.* Now I renew my question."

Counsel for plaintiff again objected that it was not a question of opinion at all. It was what it actually did. It was for the jury to say whether it did or not properly manage it, if the question was to go to the jury at all. It was not a question of opinion for the witness. The court did not admit the testimony.

We think this was error. No objection was taken to the leading character of the question. The witness showed a familiarity with the river, and of the manner to some extent in which logging was done upon it, and had himself run logs upon a portion of it. He also knew from his own observation the condition of the river, and the logs in it, and what was done. We think these facts qualified him to speak upon the subject queried after. The testimony was material. Its effect was for the jury. The court erred in ruling it out. It is true, it involved an opinion upon one of the main facts in the case which was to be found by the jury, but their judgment in nearly all cases may be aided in this way when the witness is shown to be sufficiently qualified to give an intelligent opinion upon the subject

With a view of showing that plaintiff did not get his logs on the Coburn job to the rollways in time to put them in the river in the spring, counsel for defendant asked witness Mitchel:

" What can you say as to the manner in which that job was conducted? "

This was objected to as not competent, and irrelevant, and the objection was sustained. The ruling was correct. The manner the plaintiff did his job, or at what time he did it, whether within the contract or not, was of no concern to the defendant, and could not have any effect, by way of excuse or otherwise, for any obstruction to the

right of passage of plaintiff's logs down the stream. The plaintiff was entitled to the use of the stream upon which to float his logs down to the lake, according to the natural current of the stream, where the water was not lawfully used by others for floatage.

The record shows that the boom company was paying its men $1.85 per day, and that the men wanted $2 per day for 10 hours' work, and refused to work unless it was paid to them by the company, and the company refused to give them employment at that price, and the men went on a strike. Counsel for plaintiff, on cross-examination, proposed to show the unreasonableness of the wages offered by the company, and after showing that, after waiting about three weeks, the company finally paid the men what they asked (the president of the company was being examined), witness was then asked:

"Didn't you get a written agreement from the owners of the logs to save your company harmless from failure to deliver the logs?"

This was objected to as incompetent and immaterial. The testimony was rejected. The witness was then asked:

"Is it not a fact, Mr. Smith, that you refused to employ these men, by reason of the mill-owners and others having logs in the stream there, that you were running for, agreeing not to make any claim for damages against you or your company?

"A. If there was any such thing, they volunteered it.        *        *        *        *        *        *        *        *        *        *

"Q. There was such a transaction, wasn't there?

"A. I never saw any myself.

"Q. Didn't you ever hear of it from the company?"

This was objected to same as at first, and witness was allowed to answer:

"I think there was some such an instrument at the time. Never saw it or read it."

· This testimony was not admissible. It was subject to the objection made of incompetency. The contents of the paper were given in the question describing it. No such paper was introduced. It does appear the witness knew nothing of such a paper, and it does not appear who told him it was in existence. This testimony was seriously mischievous in its character, and ought not to have been received. There may even be some question about the admissibility of the paper itself, if the contents should turn out as intimated in the question.

We find nothing further in the rulings of the court in taking the testimony needing our consideration here.

The following requests to instruct the jury made by counsel for the defendant were refused by the court as requested, and exception was taken to each of said refusals:

"1. That the plaintiff in each count in his declaration has alleged that the defendant wrongfully, unlawfully, willfully, and injuriously caused the logs it was driving to form jams, and placed booms across the river at different places below the rollway, and refused to remove them, with intent to injure the plaintiff, and prevent the plaintiff putting afloat certain logs for Roys & Co. within the time specified in his contract with them. I instruct you that such allegation in the plaintiff's allegations charges defendant with malfeasance, that is, with willfully and intentionally injuring the plaintiff, and that such allegation does not charge the defendant with nonfeasance, that is, with doing a lawful act in so negligent a manner that the plaintiff suffered injury therefrom. And I further charge you that there is no evidence in the case tending to show that the acts complained of were done willfully, with intent to injure the plaintiff. You must render a verdict for the defendant."

"5. I instruct you that the evidence of loss of time by plaintiff's men is too uncertain to form a basis for the allowance of damages."

"7. I charge you that plaintiff cannot recover for any expense in extending his tram-road at the rollway."

"9. I instruct you upon the whole record to find a verdict for the defendant."

In regard to the first request we think counsel for defendant errs in stating the substance of the plaintiff's declaration as charging defendant with malfeasance only. The declaration does set forth all the facts, and alleges a duty arising therefrom resting upon the defendant, and not only negligent departure therefrom, but willful action in the premises, whereby the plaintiff has sustained injury and damage.     We do not think the variance exists between the pleadings and proofs on the part of the plaintiff claimed by counsel for defendant.     Neither does the case come within the rule laid down by the majority of the Court in *Macumber v. Booming Co.*, 52 Mich. 195 (17 N. W. Rep. 806).

While the declaration does not use the word "negligence," it states that the defendant was guilty of acts and omissions which necessarily imply negligence.     The first count avers that the defendant—

"Disregarding its duty in the premises, wrongfully, unlawfully, willfully, and injuriously permitted and caused the logs and timber it was driving and running down said river to form jams in," etc.

This language implies non-feasance as well as misfeasance, the declaration having previously stated the duty of the defendant in the premises.     There was some testimony tending to show non-feasance,—enough, at least, to be submitted to the jury.     All objections taken to the declaration on the ground of variance and misstatement of cause of action were properly overruled by the court.

The defendant's fifth request to charge cannot be sustained.     It asks that the loss of time of the plaintiff's men caused by the alleged wrongful acts of the defendant be not allowed as an element in computing the damages.     Certainly, under the declaration and theory of the plaintiff it constituted a part of his damages.     The plaintiff had a right to include all of his damages, if

rightly declared for, and we think this was, and the court was not in error in rejecting the request.

The seventh request to charge relates to the building of an extra tram-road by plaintiff, claimed to have been made necessary by the wrongful acts of defendant charged. This item of damage was not allowed to go to the jury by the express direction of the court, and there is no occasion to consider it further.

The case was a proper one for the jury upon its facts, and the circuit judge did not err in not holding otherwise, as requested in defendant's ninth request.

The court charged the jury, upon its own motion, that,—

"Upon the question of interest, I say to you that if you find, under the instructions that I have given you, for the plaintiff, I think it would be proper to give him interest from the time that the last expense was incurred. That was sometime in the year 1883."

We think this charge was erroneous, and the error cannot be corrected in the judgment, for the court has no means of ascertaining the amount therein contained. The damages were not only unliquidated, but the existence of any such claim could not be determined prior to the rendition of the verdict. 1 Suth. Dam. 610; *Lucas v. Wattles*, 49 Mich. 383 (13 N. W. Rep. 782); *L. S. & M. S. Ry. Co. v. People*, 46 Id. 193 (9 N. W. Rep. 249); *McCreery v. Green*, 38 Id. 185; *Davis v. Walker*, 18 Id. 25.

There are no other assignments of error which it is needful to discuss; but for those noted we think judgment should be reversed, and a new trial granted.

CHAMPLIN and LONG, JJ., concurred with SHERWOOD, C. J.

CAMPBELL, J., (*dissenting*). As the opinion of the Chief Justice disposes of all but three questions in favor

of affirmance, and as we think there is no error on those three questions, and that the judgment should be affirmed, it is only necessary to refer to the points on which we do not agree with the Chief Justice.

The witness Moon, who, so far as knowledge of methods of driving are concerned, was probably competent enough, was not allowed to answer these questions:

"What can you say as to whether the boom company handled the logs in the river as well as they could have been handled?"

"So far as your observation of the river went, and the operation of the boom company on these logs, state whether it was properly done or otherwise."

"State the manner in which the boom company handled the logs in the river; to your knowledge, that year."

The answer to this last question was stricken out, and was as follows:

"Well, I think they were handled well, as far as I know anything about it."

This action was not based on any lack of skill in running the log-drive that year, but for the conduct of the defendant in shutting up the river at various times, and in keeping back plaintiff's logs above from coming down the stream in due time. The witness testified to no knowledge of the matters actually complained of, and they were not in any sense questions of skill and good management. Had they been such questions it could have made no difference, for the witness did not testify from any such knowledge of defendant's conduct through the whole season as would have informed him on the material question, which was whether plaintiff had been improperly obstructed and hindered in getting his logs down.

A part of this blockade was laid by defendant to difficulties in getting workmen; and whatever this may have had to do with the result, it was not one of the elements which Moon could have included, or have had any right

to include, in any estimate which could go to the jury. But he was not asked, and does not appear to have known, anything about it.

We do not think it was error to allow defendant's president to be cross-examined fully concerning the excuse of the strike, and the reason why men were not employed. It was not irrelevant to show, on cross-examination, that witness was induced to hold out against the men by getting an agreement of indemnity from the log-owners affected by the delay. We can see no reason why he could not be cross-examined as to the existence of a written agreement to that effect. The case was not one where such testimony would be excluded, because not the best evidence, and had not reached a point where, if such an objection would apply, it had any application. The existence of papers is very generally allowed to be shown by parol. Where their contents are to be shown, and their tenor becomes important, it is generally, but not always, true that the paper must be shown. This witness, who was certainly one who was likely to have heard, admitted he had heard of such a paper. It belonged to defendant, if to any one, and its existence and possession could only be shown by inquiry. It was not likely the matter was of any importance on the trial, but it was not error to allow the witness to be sifted as to his motives.

We think that where expenses paid form part of the damages there should be interest allowed after the payment, as was done in this case. Unless the money expended is compensated by interest, the party can never be made good for his losses.

We think the judgment should be affirmed.

MORSE, J., concurred with CAMPBELL, J.