**FORD MOTOR CO. v. BRADLEY TRANSP. CO.**

**BRADLEY TRANSP. CO. v. FORD MOTOR CO.**
Nos. 10738, 10739.

United States Court of Appeals
Sixth Circuit.
April 11, 1949.

Sparkman D. Foster, of Detroit, Mich.
(Sparkman D. Foster, Charles J. Fellrath,
Duane D. Freese, and Allan B. Lutz, all of
Detroit, Mich., on the brief, and Wm. T.
Gossett, of Dearborn, Mich., and Foster &

Lutz, of Detroit, Mich., of counsel), for Ford Motor Co.

Lucian Y. Ray, of Cleveland, Ohio (Lee C. Hinslea and Lucian Y. Ray, both of Cleveland, Ohio, and Percy J. Donovan, of Detroit, Mich., on the brief, and Leckie, McCreary, Schlitz & Hinslea, of Cleveland, Ohio, Beaumont, Smith & Harris, of Detroit, Mich., of counsel), for Bradley Transp. Co.

Before HICKS, Chief Judge, and ALLEN and MARTIN, Circuit Judges.

ALLEN, Circuit Judge.

The instant appeal and cross-appeal attack a judgment in an action at law growing out of a collision at the plaintiff's River Rouge plant between a steamer owned and operated by the defendant and a coal and ore unloader belonging to the plaintiff.[1]

The complaint, in addition to claiming damages for the destruction of a Hulett unloader, averred that the plaintiff's Mead-Morrison coal bridge was struck and damaged, and that substantial damage was done to the track rails, snubbing post, concrete wall, concrete on the face of the dock, railroad tracks, the hot rail and guard fence and other portions of the dock. It was also averred that damage was incurred due to the loss of the use of the Hulett, causing delay in the unloading of plaintiff's boats.

The District Court, trying the case without a jury, entered judgment for the plaintiff in the amount of $201,227.69.

Plaintiff contends that the judgment does not compensate it for the loss sustained. Defendant contends that it was not guilty of negligence in the navigation of its steamer; that the plaintiff was guilty of contributory negligence as a matter of law, and that if the defendant is liable, the court committed reversible error in its assessment of damages.

The facts are fully set forth in the opinion and findings of fact of the District Court, 74 F.Supp. 460, and will not be repeated here in detail, the following being sufficient background to present the questions argued in this court.

On the night of November 29, 1944, the defendant's self-unloading steamer Carl D. Bradley struck and knocked over the plaintiff's Hulett coal and ore unloader upon plaintiff's dock at the boat slip which connects with the River Rouge at Dearborn, Michigan. The record shows that the Hulett was used as a part of the plaintiff's production unit consisting of a coke oven, blast furnace, storage bins, the dock, the slip and the turning basins. The Hulett was used in servicing the open-hearth blast furnace, the foundry and the power-house with coal, limestone and sand brought in by water. A few of the boats which serviced this production unit were self-unloaders, but for the most part the unloading and transfer of the materials into the transfer bins was done by two Huletts and a Mead-Morrison coal tower, the material being conveyed into the coke ovens and hoppers of the blast furnace from the transfer bins. The record shows that over three million tons of the materials in question were handled in 1944 on the unloading docks by the Hulett unloaders and the Mead-Morrison coal tower.

The two Huletts were identical in structure, being 80 feet in height, weighing 550 tons, and having a span of 70 feet. They were based at the rear on a concrete wall, and extended across and above three sets of railroad tracks and a roadway. The legs of the Hulett rest upon tracks or rails so that it may be moved up and down the dock. Its speed is some 90 feet a minute. The Hulett lifts the cargo by a clam bucket and dumps it into small cars. The Mead-Morrison coal tower also has a clam bucket, which is operated by steel cables. It is mobile, and travels upon the same rails as the Huletts. The Huletts were set back some 15½ inches from the edge of the concrete portion of the dock. On the night of the accident the two Huletts were 100 or 150 feet apart, and the Mead-Morrison was approximately 10 feet south of the south Hulett.

On the afternoon before the accident the Bradley arrived at the plaintiff's dock, which is located on the east side of a slip 250 feet wide leading off from the River Rouge in a generally northerly and souther-

---

[1] The parties will be referred to throughout this opinion as in the court below.

ly direction. The vessel was then unloaded, the operation being completed about 11:15 p. m.

Plaintiff's dock is some 2,594 feet long. The north end of the slip is closed, and large vessels leaving the dock either back or are pushed into the turning basin at the south end of the slip where the channel widens out and enters the River Rouge.

The Bradley is 638.9 feet long, and has a beam of 65 feet. During the unloading the vessel lay with her starboard side to the dock, and the Tug Oregon, which was to assist the Bradley in departing from the slip, was at the Bradley's port bow, facing south. In accordance with instructions from the master of the Bradley, the tug held the Bradley's bow against the dock with her stern angling slightly away from the dock, and worked slowly ahead. The master of the Bradley was experienced, and three experienced watchmen, two of them on the forecastle head, were helping to conduct the operation. The Bradley was proceeding at the rate of one to two miles per hour. As she came abreast of the north Hulett, the lookout reported that her bow was about three feet from the Hulett. As the Bradley passed the south Hulett the machine toppled over the vessel. The District Court found in effect that the starboard bulwark of the Bradley had overhung the dock line and had struck the Hulett because of the negligent navigation of the Bradley. The Mead-Morrison coal tower and certain parts of the dock and equipment thereon were also injured in the accident.

Defendant does not contest the finding of the District Court that its steamer struck and toppled over the south Hulett, thereby causing the damage. It claims that it was not negligent in its maneuvers and that the plaintiff was guilty of negligence as a matter of law by reason of (1) its failure to move the Huletts out of the zone of danger, (2) its failure adequately to light the dock, and (3) permitting the Huletts to remain on the dock in a locked condition.

We think the District Court's findings of fact upon the question of negligence are not clearly erroneous, Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A., and that its conclusions are sound.

The bow of the Bradley had an unusually broad flare. The trial court found that when its stern was 15 feet out from the dock the bow had an overhang of 24 inches, and when it was 25 feet out it had an overhang of 30 inches, near the point where the head of the forecastle came. Gray paint, apparently from the bulwarks of the Bradley, was found on the Hulett girder. The master knew, or should have known of the possibility of overhang. The record supports the conclusion of the District Court that the master failed properly to take the overhang into account. He knew, or should have known, that with the particular maneuver which was attempted, involving the angling of the stern away from the dock, an excessive overhang might develop and damage property on the dock. He knew that the Huletts were stationary within the dock line. One of defendant's experts admitted that it is a well known principle of navigation that where a ship is moving in a slip and the master permits the ship to overhang the dock and damage something inside the dock line, negligence exists. Cf. Inland & Seaboard Coasting Co. v. Tolson, 139 U.S. 551, 11 S. Ct. 653, 35 L.Ed. 270. The master stated that he knew that with his vessel's stern at a point abreast the after chocks on the starboard side 15 feet from the dock, the ship would be bearing against the dock just aft of the break on the forecastle deck. He knew there was an 18 mile an hour wind from the west or northwest, that dense smoke was coming from the tug, and should have known that this would, as it did, prevent his lookouts from keeping an adequate watch. This was in violation of a primary rule of navigation. Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 26 F.2d 603; United States v. Black, 1 Cir., 82 F.2d 394. In fact one of the watchmen on the forecastle ran behind the cabins to avoid the smoke. The lookouts failed to report to the master their difficulty with the smoke, and by the time the third mate on the bow saw the dangerous proximity of the second Hulett and ran back to notify the tug to pull the bow out, it was too late. The steamer struck the Hulett and it toppled over.

■ While under Michigan law, applicable here, the doctrine of res ipsa loquitur does not prevail, Thurkow v. City of Detroit, 292 Mich. 617, 621, 291 N.W. 29, the Michigan courts have held that the rule should not be extended so as to deny a right of action where there is room for balancing the probabilities and for drawing reasonable inferences better supported on one side than the other. Cf. Schoepper v. Hancock Chemical Co., 113 Mich. 582, 71 N.W. 1081. In cases tried without a jury, under Michigan decisions the court may draw legitimate inferences from established facts, Grimes v. King, 311 Mich. 399, 18 N.W.2d 870, and negligence may be inferred from circumstances which place the case within the field of legitimate inferences from established facts. Anderson v. Kearly, 312 Mich. 566, 20 N.W.2d 728. Here the fact that the Hulett was more than a foot inside the dock line, that the dock was lighted, and that the master of the Bradley knew that excessive angling of the stern away from the dock, together with the broad flare of the Bradley's bow, might cause damage to persons and property on the dock, removes the case from the realm of speculation. Cf. Thurkow v. City of Detroit, supra, 292 Mich. 617, 622, 291 N.W. 29. The court was clearly justified in inferring that negligence of the Bradley's master and crew caused the accident.

■ Under this record the District Court was also justified in holding that no contributory negligence existed. Evidence was presented to the effect that at certain other docks on the Great Lakes Hulett coal unloaders were usually moved away while boats were going through maneuvers similar to those here involved; but no proof amounting to a custom was introduced. Cf. Chicago, Milwaukee and St. Paul Railway Company v. Lindeman, 8 Cir., 143 F. 946. Moreover, on the docks in question the Huletts were built flush with, or extending beyond, the dock face. Defendant did not request that the Huletts be moved on this occasion. The striking of a fixed object on the dock by a moving steamer constitutes damage not ordinarily done by a boat under control and carefully managed, and is prima facie evidence of negligence. Inland & Seaboard Coasting Co. v. Tolson,

supra, 139 U.S. 551, 555, 11 S.Ct. 653, 35 L. Ed. 270, cited with approval in Jesionowski v. Boston & Maine R. Co., 329 U.S. 452, 456, 67 S.Ct. 401, 91 L.Ed. 416, 169 A.L.R. 947; The Buffalo, 2 Cir., 56 F.2d 738. Plaintiff was not bound to assume possible negligence on the part of the Bradley, nor was it bound to take any action with reference to a navigation operation which was wholly within defendant's control.

■ As to the contention that the dock was improperly lighted, the District Court found to the contrary upon substantial evidence. Nor did the fact that the Huletts and the Mead-Morrison were locked constitute contributory negligence. Defendant argues in this connection that if the unloaders had not been locked they might have moved along the tracks when struck, and no injury would have been sustained. It is conceded that the plaintiff was bound to maintain its dock in a reasonably safe condition. Smith v. Burnett, 173 U.S. 430, 433, 19 S.Ct. 442, 43 L.Ed. 756. This duty, however, extends to persons on the dock as well as to boats alongside. Plaintiff would have been guilty of a breach of duty toward men on the dock if it had not locked the ponderous devices for the night and had left them mobile on the track. Since plaintiff had no reason to anticipate that the Bradley would be so operated as to strike stationary objects within the dock line, there was no negligence in its handling of the Huletts.

The judgment of the District Court as to liability is correct.

The question of damages is less simple. We consider first items of damage challenged by plaintiff. With reference to the allowance for replacement of the wrecked Hulett, the original cost was $126,000, but the cost of a new Hulett as of January, 1945, would have been $390,000 to $400,000. The expense of repairing it was figured by defendant's expert at $125,000, and by plaintiff's expert at $420,000. It had been built according to special specifications, for use on the particular docks on which it operated and concededly had no market value. The court found that the cost of a new Hulett would be $395,000, deducted depreciation for 23 years, and allowed the amount of $135,-

428.52, based upon 35 years as being the useful life of the Hulett.

The accident occurred during the war emergency, and the securing of a new coal unloader was vitally necessary to plaintiff's war effort. It bought a Mead-Morrison coal and ore unloading tower of the same type as the original Mead-Morrison, to replace the Hulett. This machine had an unloading capacity of 15 tons as against the 12-ton capacity of the Hulett.

Plaintiff vigorously attacks the allowance of $135,428.52 for the wrecked Hulett, contending that it should have been compensated for the entire cost of the Mead-Morrison actually erected to replace the Hulett, namely, $435,889.42, without any deduction for depreciation, reduced by allowable credits. It is urged that the allowance in this amount for this item is required, on the theory that the Hulett was an integral part of the production unit consisting of docks, slip, storage bins, blast furnace and coke oven. Plaintiff relies on decisions which hold that if an integral part of a machine, as, for instance, the fender of a car, Stephens v. Hamtramck Bottling Works, 224 Mich. 156, 194 N.W. 483, or the span of a bridge, Cf. J. W. Paxson Co. v. Board of Chosen Freeholders, 3 Cir., 201 F. 656, or the gears on a ship, Cf. Shepard S. S. Co. v. United States, 2 Cir., 111 F.2d 110, has been destroyed by negligence, the tort feasor is liable for the full cost of replacing the integral part.

■ There are two answers of substance to this contention, both of which require the overruling of plaintiff's objections to this phase of the judgment. In the first place, the coal unloader which was substituted, although it performed the same function as the Hulett, was far from being identical with it. The Huletts were built primarily for unloading ore, and were not so efficient in handling coal as the Mead-Morrison. Other differences also existed. When the Mead-Morrison unloads ore, the bucket of the rig has to be changed. Testimony was given that while the Mead-Morrison digs the boat faster than the Hulett, when the digging is done the coal or ore has to be cleaned out from under the hatches. A change in the buckets is re-

quired for this, and it was stated that time was lost with the new rig because the coal towers cannot rotate under the hatches so well as the Huletts. Plaintiff endeavored to show that the unloading was actually slower with the two Mead-Morrisons and one Hulett than with the two Huletts and one Mead-Morrison in order to rebut defendant's claim that the new machine was better than the Hulett. However, plaintiff's own witness explained the slowness of operation by the fact that the men might not have been acquainted with the new machine, and that they were "maybe not getting the efficiency out of the men." Whether more or less efficient than the Hulett the Mead-Morrison was a different machine. We have been cited to no decision which holds that the rule contended for by plaintiff applies where an entire and totally different machine is substituted for that destroyed.

The second and conclusive answer to plaintiff's contention is that the Hulett was not in fact an integral part of the dock structure. While it ran on tracks, it was mobile throughout the entire length of the dock. The District Court correctly applied the law as to damages growing out of the loss of the Hulett. The proper measure of damages was the value of the Hulett at the time of the accident. Since it had no market value, the court properly considered the cost of reproduction at the date of valuation as constituting evidence bearing upon the ascertainment of value. Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890.

■ Plaintiff also contends that the court made a clearly erroneous finding in determining that the useful life of the wrecked Hulett was 35 instead of 50 years. The testimony was in controversy on this point, and substantial evidence supports the finding. While one expert stated that in his opinion the useful life span of the wrecked Hulett was 50 years, the same expert had stated in a letter that depreciation of the Huletts is often taken on the basis of 30 to 35 years. Another expert set the useful life at from 30 to 35 years. Moreover, since the record shows that the wrecked Hulett was not placed in operation

until 1922, although it was purchased in 1917, the court did not abuse its judicial discretion nor commit reversible error, as contended by the defendant, in figuring the depreciation from 1922.

██ Nor do we think that the court's allowance of a credit to the defendant of $7,500 for bed plates and other heavy parts of the wrecked Hulett was clearly erroneous. The allowance was based on the valuation set by the plaintiff's expert, and the fact that the parts were actually sold as scrap does not require that the expert's valuation be disregarded.

██ Items of damage attacked by defendant include the award to plaintiff of $27,850, the amount which was paid by plaintiff for the delivery of limestone and coal required for its own operation during the period before the wrecked Hulett was replaced. The court had already made an award of $19,934.38 as compensation to plaintiff for time lost due to the Hulett's being not available for the year 1945.

The award comprised items of $18,750 paid to vessels delivering limestone, $7,000 to vessels delivering coal, and $2,100 to barges delivering .coal. During this time plaintiff's own· vessels which could have been used in the operation were engaged in the iron ore trade in which they received 90 cents a ton for cargoes of iron ore transported. The expense of chartering self-unloaders to transport limestone to the River Rouge was 50 cents per gross ton, and for coal 28 cents per net ton.

The payment of the above amounts by plaintiff as charter hire for vessels to carry the cargoes is not disputed, but defendant urges that the expenditures were in no way attributable to the accident, and hence cannot be included in the allowable damages. We think this contention has no merit.

The exhibits in evidence show that while in 1944 no coal at all was hauled in self-unloaders, 165,046 net tons were hauled in 1945. Whereas in 1944, 37,054 gross tons of limestone were hauled in self-unloaders, in 1945, 100,736 gross tons were hauled in self-unloaders. These statistics demonstrate that self-unloaders were used to a much greater extent in 1945 than in 1944. It is a reasonable inference from all the

facts, the destruction of the Hulett, the necessity for rapid unloading of material due to the war effort, and the increased use of the self-unloaders, that they were employed because of the needs growing directly out of the unavailability of the Hulett. The extra time required, due to loss of the third unloading rig, based on actual unloading performance in 1944, as compared to actual performance in 1945, was shown to be for iron ore, 223 hours and 32 minutes; for limestone, 29 hours and 44 minutes; and for coal, 125 hours and 9 minutes. Since iron ore is not carried in self-unloaders, the District Court calculated how many trips could have been made for limestone in the 223 hours and 32 minutes. It calculated three trips of 125,000 tons each at fifty cents a gross ton, and allowed $18,750 for this item. It estimated that two trips could have been made for coal in a motor ship, at 12,500 tons each, and allowed twenty-eight cents a ton, totaling $7,000. For the barge it allowed $2,100.

This is not, as contended by the defendant, a duplication of the items allowed for the lost time, namely, $19,934.38. It is the out-of-pocket money conceded to have been spent by plaintiff to have material hauled which plaintiff's 'ships could have hauled if the delay had not occurred. The record does not show that these findings· were clearly erroneous.

██ We find no reversible error in the inclusion of overhead in the costs allowed plaintiff for repair and demolition of the equipment and parts of the dock, track, etc., damaged in the accident. The figure used is that applied to all of plaintiff's government contracts. The record shows that the repair and demolition would have cost much more if an outside concern had performed the service at a profit.

Finally, we consider the items of five per cent interest allowed on the amount awarded for the wrecked Hulett, namely, $130,-397.77 from December 30, 1944, until entry of judgment, and on $47,784.38, which was for damage caused by the unavailability of an unloader from November 30, 1945, until the entry of judgment.

Defendant contends that the claims were tort claims involving damages entirely un-

liquidated, and that interest hence is not allowable as a matter of right until judgment is entered. It relies for this proposition upon the decision of this court in Grand Trunk Western R. Co. v. H. W. Nelson Co., 6 Cir., 116 F.2d 823, 841, which states:

"The Michigan cases on the subject involve some confusion and uncertainty but while the tendency of the courts of that State is to extend the right to recover interest on demand far beyond the limits to which the right was originally confined, Taylor v. [Bay City St.] Railway Company, 101 Mich. 140, 59 N.W. 447, and in cases where the damage is complete and the amount of the loss fixed as of a particular time, interest will not be withheld merely because the damages are unliquidated, yet, in cases of tort or on contract where both the right of recovery and the amount of damages are alike uncertain until a verdict is had, interest is not allowable as a matter of right until the damages become fixed. Coburn v. Muskegon Booming Company, 72 Mich. 134, 40 N.W. 198; Nelson v. Stewart, 174 Mich. 127, 140 N.W. 544; McGuire v. Galligan, 53 Mich. 453, 19 N.W. 142; Hettler Lumber Company v. Olds, 6 Cir., 242 F. 456."

It is to be noted, however, that the court did not say here that interest could not be allowed before judgment, but simply that it was not allowable as a matter of right. The court went on to state:

"Under the facts here, interest was not demandable of right, but was a question for the jury to decide under appropriate instructions. Lucas v. Wattles, 49 Mich. 380, 13 N.W. 782.

"In our opinion, it could not be determined as a matter of law that appellee's claims for overhaul or damages due to delay were either fixed or liquidated for a definite and certain amount on any date prior to determination by the jury. * * *

"The rule prevails in Michigan that when necessary in order to arrive at fair compensation, the court or jury in the exercise of a sound discretion, may include interest or its equivalent as an element of damages, but interest is not to be separated from the damages allowed by the jury."

As indicated, the Michigan courts hold that interest in a tort case is allowable in the discretion of the trier of the facts from the date of the accident or the accrual of obligations. This has been specifically announced in leading Michigan cases involving injury to property in which interest was allowed from the date of the accident or injury. Taylor v. Bay City St. Railway Company, 101 Mich. 140, 59 N.W. 447; Gates v. Comstock, 113 Mich. 127, 71 N.W. 515; Standard Oil Co. v. Payne, 220 Mich. 663, 190 N.W. 769, certiorari denied, Davis v. Standard Oil Co., 263 U.S. 699, 44 S.Ct. 5, 68 L.Ed. 513.

The District Court found the amount of loss on the Hulett was plainly fixed within a month after the damage, and that damage growing out of the fact that the Hulett could not be replaced until the beginning of navigation in 1946 was fixed and determined at the close of navigation in 1945, namely, November 30, 1945. These findings are supported by the record.

It follows that the District Court applied the established law of Michigan in allowance of interest.

The judgment is affirmed.