558 F.2d 790
 BUNGE CORPORATION, Plaintiff-Appellant Cross-Appellee,
v.
M/V FURNESS BRIDGE, her engines, tackle, apparel, etc., in
rem, Defendant,
Furness Withy & Co., Ltd., in personam, Defendant-Appellee
Cross-Appellant.
 No. 75-2695.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 2, 1977.
 
 Nigel E. Rafferty, John F. Blackwell, New Orleans, La., for plaintiff-appellant cross-appellee.
 Cornelius G. Van Dalen, Leonard A. Radlauer, New Orleans, La., amicus curiae, for Board of Comm. of the Port of New Orleans.
 J. Dwight LeBlanc, Jr., New Orleans, La., for defendant-appellee cross-appellant.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before GEWIN, AINSWORTH and SIMPSON, Circuit Judges.
 SIMPSON, Circuit Judge:
 
 
 1
 Bunge Corporation, a wharf owner, brought suit in rem against the M/V Furness Bridge and in personam against her owner, Furness Withy and Co., for damage which the vessel inflicted upon a mooring dolphin while attempting to berth at the wharf.*
 
 
 2
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 3
 The district court held that the negligence of both plaintiff and defendant caused the accident and equally divided the damages. In reaching this conclusion, the district court emphasized the special characteristics of the Furness Bridge, which was more than twice the length of the Bunge dock and then the largest ship ever to navigate the Mississippi river: "Supertankers may call for super precautions on the part of those who invite them to berth at facilities designed for lesser vessels." Bunge Corp. v. MV Furness Bridge, 396 F.Supp. 852, 856 (E.D.La.1975). Taking into account the relative sizes of the ship and the wharf, the district court held Bunge to a stricter standard of care than has ever previously been required of wharfingers. While we agree that the standard of care must be measured in the context of specific situations, we feel that the district court imposed too stringent a standard on Bunge and reverse on that ground.
 
 I. THE FACTS
 
 4
 The district court has concisely set out the facts of this case:
 
 
 5
 Bunge owns and operates a grain elevator and dock. The dock consists of a steel piled wharf with five mooring dolphins, two located upstream of the wharf and three located downstream of the wharf. The total distance between the dolphins is 820 feet. The dolphins are recessed about 2 feet from a line that would run along the face of the wharf, do not serve as breasting dolphins, and do not have fenders. There should be no contact between them and a ship entering or leaving the dock. The positions of the mooring dolphins as well as the fact that they do not have fenders is obvious, at least in day light, as they are in plain view.
 
 
 6
 Bunge's wharf has an area capable of withstanding breasting forces 470 foot long. If the dolphins were capable of withstanding a breasting force, they would add to the frontage against which a vessel might breast; but, as they stand, they do not. In addition, since their maximum span is 820 feet, they afford no facility for putting out lines fore and aft of the vessel itself.
 
 
 7
 The wharf was designed only to accommodate vessels under a displacement tonnage of 33,750 tons, mooring at a velocity of 1/4 of a foot per second (less than one mile per hour), and approaching the wharf at an angle of 10 degrees or less. By contrast, the Furness Bridge displaced 112,000 tons.
 
 
 8
 The Furness Bridge is more than twice as long as the wharf; its length and bulk make great care necessary in berthing it, for the unprotected dolphins are not designed to take breasting forces. Elementary geometry demonstrates that a vessel twice the length of the wharf may strike one of the dolphins if it approaches at an angle of 3 degrees, while a 400 foot vessel would have to approach at a greater angle or miss the wharf completely before striking the dolphin.
 
 
 9
 The Furness Bridge was under the exclusive custody and control of employees of Furness Withy; it was operating under a time charter to Seabridge, who voyage subchartered to Bunge. Both charters contained "safe berth" clauses but the Bunge-Seabridge charter did not incorporate the Furness Withy-Seabridge charter nor did Bunge make any independent stipulations in favor of Furness Withy.
 
 
 10
 During the daylight hours of January 15, 1974, the Furness Bridge was lying upriver from the Bunge dock. Toward the end of the day, Bunge ordered the vessel into berth that night. The master objected and asked that he be permitted to wait until morning. Bunge replied that, if the vessel was not ready to berth at night, it would be taken off hire until it proceeded.[1] The master then undertook to attempt a berth.
 
 
 11
 What happened during the berthing is much disputed but I am persuaded that a preponderance of the credible evidence indicates that Bunge gave only the rudimentary instruction about berthing procedures; it informed the vessel that the custom was to drop both anchors upriver of the berth, then drop back and dock alongside. The owner's agent sought no instructions as to whether three or four tugs were needed; having docked at New Orleans with three, having no warning that this number would be insufficient, he ordered three. Hindsight demonstrates that using four would have been much safer.
 
 
 12
 The Furness Bridge was navigated stern first downriver, using the current, and maneuvered in crab-fashion towards the dock, using lines and cables. When it was about fifty feet off the dock it began to move into the berth. A line was put ashore from the bow to the upstream dolphin. A few minutes later the aft line was put ashore. As the vessel moved in the river the fog increased, obscuring visibility at the river level, although the lights atop the docking facility were clear. The vessel was moving forward and upriver toward the dock, at an angle of less than 5o , when the starboard side of the bow struck the upriver dolphin. At the time the vessel was moving at a slow speed, using considerable caution.
 
 
 13
 The vessel thereafter completed berthing and was moored alongside fore and aft at 0025 hours on January 16, 1974. However, she had to keep one tug in attendance at all times to keep her bow next to the wharf. In spite of these efforts, she broke away from the wharf at approximately 2020 on January 16. During the time the vessel was alongside, she pulled 4 bollards or cleats off the Bunge facility.
 
 
 14
 The M/V Furness Bridge redocked a day later in daylight using 4 tugs.[2] This time the docking was without incident.
 
 
 15
 396 F.Supp. at 854-55.
 
 II. THE APPLICABLE STANDARD OF CARE
 
 16
 " It is well established that there is a presumption of fault against a moving vessel that strikes a stationary object, such as a dock or navigational aid." Freeport Sulphur Co. v. S/S Hermosa, 368 F.Supp. 952, 953 (E.D.La.1973); Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724 (5th Cir. 1967). "In admiralty, this presumption does more than merely require the ship to go forward and produce some evidence on the presumptive matter. The moving vessel must show that it was without fault or that the collision was occasioned by fault of the stationary object or was the result of inevitable accident".[3] Patterson Terminals, Inc. v. S/S Johannes Frans, 209 F.Supp. 705, 707 (E.D.Pa.1962), citing Carr v. Hermosa Amusement Corp., Ltd., 137 F.2d 983, 985 (9th Cir. 1943). We have held that "(t)he burden is heavily upon the vessel asserting (the inevitable accident) defense. 'Such vessels "must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required." ' " Brown & Root Marine Operators, Inc., supra, 377 F.2d at 726. Furthermore, the presumption of negligence is amply supported by logic and experience:
 
 
 17
 The common sense behind the rule makes the burden a heavy one. Such accidents simply do not occur in the ordinary course of things unless the vessel has been mismanaged in some way. It is not sufficient for the respondent to produce witnesses who testify that as soon as the danger became apparent everything possible was done to avoid an accident. The question remains, How then did the collision occur? The answer must be either that, in spite of the testimony of the witnesses, what was done was too little or too late or, if not, then the vessel was at fault for being in a position in which an unavoidable collision would occur.
 
 
 18
 Patterson Oil Terminals v. The Port Covington, 109 F.Supp. 953, 954 (E.D.Pa.1952).
 
 
 19
 Where a berthing facility has been damaged, the shipowner may rebut the presumption of negligence by proving that the wharfinger violated the standard of care to which he is held and that this violation was the proximate cause of the damage claimed. Regarding the wharfinger's duty, we have stated the prevailing view as follows:
 
 
 20
 It is well settled that a wharfinger is not the guarantor of the safety of a ship coming to his wharf. He is, however, under a duty to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel. This includes the duty to ascertain the condition of the berth, to make it safe or warn the ship of any hidden hazard or deficiency known to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him and not reasonably known to the shipowner.
 
 
 21
 Trade Banner Line, Inc. v. Caribbean Steamship Co., S.A., 521 F.2d 229, 230 (5th Cir. 1975). The wharfinger's duty to warn applies only to "any hidden hazard or deficiency . . . not reasonably known to the shipowner". Id. Thus, no warning is required "where the alleged obstruction or condition is open and obvious to those in charge of the vessel's management" or where those in control of the vessel have actual knowledge. General Construction Co. v. Isthmian Lines, Inc., 259 F.Supp. 336, 339 (D.Or.1966). See also Sabine Towing and Transportation Co. v. St. Joe Paper Co., 297 F.Supp. 748 (N.D.Fla.1968).
 
 III. THE DISTRICT COURT'S CONCLUSIONS OF LAW
 
 22
 To find Bunge contributorily negligent, the district court evaluated the wharfinger's duty in light of two factors present in the case: (1) The size of the Furness Bridge adversely affected its maneuverability in comparison to smaller vessels and increased its force of impact, and (2) the Bunge docking facility was not adequate for vessels the size of the Furness Bridge. These factors greatly enhanced the chance of a mishap, requiring "extra care" on the part of wharfinger and shipowner alike.
 
 
 23
 The degree of "extra care" that the district court required of the wharfinger departed significantly from the less stringent traditional standard. Specifically, the district court noted that the wharf owner "knows hazards not fully perceived by the mariner even though the physical objects creating them may be in plain sight". 396 F.Supp. at 856. This superior knowledge led the district court to conclude that Bunge had acted negligently in the following respects:
 
 
 24
 It failed to give full caution about the size and structure of the wharf, about the hazards of the unfendered dolphins just a short distance past the line of the wharf, about the need of so large a vessel using four tugs, and it urged berthing at night.
 
 
 25
 . . . Bunge, being a subcharterer, knew the precise characteristics of the vessel. Bunge also knew of the current in the river, the layers of river fog, the visibility problems encountered in docking at night, and the exact limitations of its wharf. It failed to take all these factors into account and give the necessary warnings to the master or take other precautions against damage.
 
 
 26
 396 F.Supp. at 857, 858.
 
 IV. APPLICATION OF THE RELEVANT STANDARD
 
 27
 In the abstract, the district court correctly described the standard of care to which wharfingers are held. If a mariner cannot fully perceive hazards even though the physical objects creating them are in plain sight, then the duty to warn attaches. For example, in Medomsley Steam Shipping Co. v. Elizabeth River Terminals, 354 F.2d 476 (4th Cir. 1966), a shipowner recovered damages from the wharfinger after a defect in a mooring cleat caused the ship to come adrift and go aground. Similarly, in White Stack Towing Corp. v. Hewitt Oil Co., 216 F.2d 776 (4th Cir. 1954), a dock owner was denied recovery against a vessel that had damaged a breasting dolphin in attempting to dock; the Court found that the dolphins had been negligently constructed in that their design was faulty. As we interpret these cases, a wharfinger is required to warn of latent defects because he is the only one who can avert an accident when the mere visibility of the dangerous physical structure is not sufficient to inform the mariner of a hidden condition.
 
 
 28
 In the instant case, the damage inflicted was not caused by a defect or dangerous condition solely within Bunge's knowledge and not discoverable by the Furness Bridge.[4] Thus, we conclude that the rule regarding hidden dangers did not come into play. There was nothing about which Bunge should have warned the vessel that the master of the vessel did not already know or that was not solely within the master's navigational responsibilities.
 
 
 29
 In further explication of our holding, we will examine point by point the omissions cited by the district court as constituting a breach of Bunge's legal duty.
 
 
 30
 1. Failure "to give full caution about the size and structure of the wharf": With regard to the structure of the wharf, the district court noted that it was designed to accommodate vessels under a displacement tonnage of 33,750 tons; the Furness Bridge displaced 112,000 tons. Had the vessel collided with the wharf and damaged it or suffered damage, Bunge might be held negligent for failing to warn about the wharf's structural limitations. Here, however, these limitations were irrelevant to the damage inflicted by the Furness Bridge which, in fact, successfully breasted against the wharf.
 
 
 31
 Although the size of the wharf was relevant to the vessel's docking maneuversand, hence, to the damage it caused, this characteristic was obvious indeed, unmistakable and required no warning. Photographs in the record and the diagram herein reproduced reveal that the 965-foot vessel was more than twice as long as the 470-foot long wharf. Those in control of the Furness Bridge must be charged as a matter of law with knowledge of the comparative sizes of their vessel and the Bunge wharf. It is further apparent that the master and pilot of the ship were in fact aware of the length of the dock. As the vessel attempted to berth, although at night and with fog forming, "(v)isibility was still good, we could still see the dock quite clearly". (R. 586, testimony of John Shewan Leask, master of the Furness Bridge). The ship's master also testified:
 
 
 32
 Q: Did anyone mention the length of the dock, by that now I am referring to the concrete dock?
 
 
 33
 A: I am sure I did know what it was, but I don't specifically remember being told the length of the dock. (R. 644)
 
 
 34
 Finally, the compulsory pilot responsible for navigating the ship during the berthing in question had docked ships at the Bunge facility 15 to 25 times. (R. 957, testimony of Myron J. Watson).
 
 
 35
 2. Failure "to give full caution about . . . the hazards of the unfendered dolphins just a short distance past the line of the wharf ": As with the dock, the ship's master and pilot knew or should have known of the presence of at least mooring dolphin No. 1, the one that was struck. The master testified that while he had seen the No. 1 dolphin in the daylight, he had not looked to see if it bore fenders necessary to withstand breasting forces, and had proceeded to dock with little or no concern over whether the vessel landed against the dolphins:
 
 
 36
 Q: Did you have an opportunity to see these dolphins on the passage from St. Maurice Street wharf to Destrahan?
 
 
 37
 A: I saw them on the way up to the anchorage, and there was a ship on the berth when we passed and that that is the only opportunity that I had of seeing the dolphins of the wharf before I went alongside.
 
 
 38
 Q: Yes, sir. Did you see the dolphins at that time?
 
 
 39
 A: I saw possibly one, the upriver one, the upstream one, it was clear of the bow of the ship.
 
 Q: That's the dolphin
 
 40
 A: the that's Number 1 dolphin, the one that we have had all the top dolphin that we use for mooring into when we came alongside.
 
 
 41
 Q: When you see that (dolphin), you see it's obviously not fitted to come in contact with the side of the ship?
 
 
 42
 A: I couldn't say that I could state that clearly on the way up the river, no, sir.
 
 
 43
 Q: You could see it didn't have any fendering around it, couldn't you?
 
 
 44
 A: Not clearly, no, sir.
 
 
 45
 Q: Did you see any fendering?
 
 
 46
 A: No, I didn't see any fendering, and I wouldn't say I was looking for any fendering. (R. 645-46)
 
 
 47
 Q: What is your understanding as to the first part of the wharf or the upstream mooring dock on the whole facility that was contacted by the ship?
 
 
 48
 A: Coming alongside the wharf similar to this one against the current, it's normal to land the vessel forward and then steer in alongside the wharf.
 
 
 49
 Q: Is that what you were trying to do in this instance?
 
 
 50
 A: This is what we did in this particular case.
 
 
 51
 Q: When you say forward, are you talking about the concrete wharf or are you saying
 
 
 52
 A: concrete wharf or the upstream part of the wharf, it would have to be possibly the upstream extremity of the dock, the vessel leans against the upstream part and then comes alongside.
 
 
 53
 Q: Are you speaking of the dolphins?A: In this case it would be the dolphins, yes.
 
 
 54
 Q: You were trying to land on the dolphins?
 
 
 55
 A: I wasn't trying to land on the dolphins, not directly, but I wasn't too concerned if we did there, to me, it would have been a perfectly normal landing to come in and approach the upstream part of the dock and the vessel swing in and come alongside at a small angle.
 
 
 56
 Q: So you were not particularly concerned about the bow of the ship striking the upstream mooring dolphin?
 
 
 57
 A: The vessel didn't strike, we just landed subsequently on the dolphin and then came alongside. I wasn't concerned about the fact this is the way they were doing it. This is perfectly normal procedure, to come alongside at a slight angle and then come alongside of the wharf. (R. 656-57)[5]
 
 
 58
 Given the master's awareness of the presence of mooring dolphin No. 1 and his lack of concern as to whether his mammoth vessel came into contact with it, we conclude that a warning by Bunge was unnecessary and likely would have been in any case a futile gesture. Bunge, the dock owner, had no duty to supervise the Furness Bridge's docking procedure, absent, perhaps, a hidden defect in the docking facilities. Rather, the master, an expert mariner, is responsible for the docking of his ship.[6] Cf. Trade Banner Inc., supra, 521 F.2d at 231. Here, the master must be charged with the natural, foreseeable consequences of his docking maneuver. As the district court noted, "(e)lementary geometry demonstrates that a vessel twice the size of the wharf may strike one of the dolphins if it approaches at an angle of 3 degrees". 396 F.Supp. at 855. Under these circumstances, the duty of care lay solely with the Furness Bridge:
 
 
 59
 The striking of a fixed object on the dock by a moving steamer constitutes damage not ordinarily done by a boat under control and carefully managed, and is prima facie evidence of negligence. Plaintiff was not bound to assume possible negligence on the part of the Bradley, nor was it bound to take any action with reference to a navigation operation which was wholly within defendant's control. (emphasis added; citations omitted)
 
 
 60
 Ford Motor Co. v. Bradley Transportation Co., 174 F.2d 192, 196 (6th Cir. 1949).
 
 
 61
 3. Failure "to give full caution . . . about the need of so large a vessel using four tugs : " We have found no evidence in the record establishing that a safe docking could not have been accomplished with three tugs instead of four. As it happened, the Furness Bridge attempted to dock on the night of January 15, 1974, using three tugs and collided with a mooring dolphin; the following night it docked safely with four tugs. Earlier, however, it had docked without incident at New Orleans using only three tugs. The district court did not indicate how Bunge could have known that four tugs were necessary[7] and, in fact, held the captain of the Furness Bridge negligent on this point: "While three tugs might have been adequate, four would, he knew from his own experience, have been better; he chose to save cost".[8] 396 F.Supp. at 858.
 
 
 62
 Under these circumstances we refuse to impose upon a wharfinger the duty of assessing the number of tugs needed by a particular vessel in docking. Use of tugs is an integral part of docking procedure and as such is a navigational operation for which the ship's master has exclusive responsibility. See A/S Atlantica v. Moran Towing & Transportation Co., Inc.,498 F.2d 158, 161 (2d Cir. 1974); Al Johnson Construction Co. v. S.S. Rio Orinoco, 249 F.Supp. 182, 187 (E.D.Pa.1965). Bunge never attempted to assert control over this aspect of the Furness Bridge's navigation. As the district court noted, the vessel "was under the exclusive custody and control of employees of Furness Withy". 396 F.Supp. at 855. This finding is not altered by the fact that the vessel was voyage subchartered to Bunge by the original time charterer, Seabridge:
 
 
 63
 Under a voyage charter, the shipowner retains full control over the navigation and operation of the vessel . . . The owner assumes the risks of insufficient speed, excessive fuel consumption, and all perils of navigation.[9]
 
 
 64
 In short, the master, and not the wharfinger, "was in charge of the operation and navigation of the vessel at all times and it was his duty to exercise a high degree of care in accordance with the skill necessary in the control and management of a modern oceangoing tankship to avoid injury to" the docking facility. Esso Standard Oil, S.A. v. The S.S. Sabrina, 154 F.Supp. 720, 724 (D.Canal Zone 1957).
 
 
 65
 4. Bunge "urged berthing at night" and failed to warn about "the layers of river fog" and "the visibility problems encountered in docking at night": Bunge cannot be held negligent for urging the Furness Bridge to dock at night. Responsibility for that decision must rest with the master, and the record is clear that Captain Leask voluntarily decided to berth in darkness although his preference was to wait for daylight. R. 581, 850-51; Defendant's Exhibit No. 10. The district court hinted at coercion by Bunge when it found that Bunge threatened to take the Furness Bridge "off hire" until it proceeded and was ready to berth at night. 396 F.Supp. at 855. The district court apparently based this finding of fact on the testimony of Captain Leask, who used the words "off hire". R. 581-82, 687. However, since the Furness Bridge was not under a time charter to Bunge, we doubt that Bunge had the power to take the vessel "off hire".[10] It is likely more precise to say that Bunge told the master that the vessel would not be paid lay time for the period during which it refused to berth.[11] According to Bunge's voyage subcharter, "(n) otification of the vessel's readiness to discharge must be delivered . . . before 4 p. m. . . . and the laydays will then commence at 7 a. m. on the next business day whether in berth or not". Defendant's Exhibit No. 6. As Bunge points out in its brief, "it is difficult to understand how a ship can be ready to load while refusing to come to berth". Brief for Appellant at 6 n. 26. Thus, Bunge's refusal to pay lay time while the vessel refused to berth appears to have been no more than an assertion of its contractual rights and cannot be viewed as a form of coercion sufficient to impose liability for negligence.
 
 
 66
 Nor can we hold Bunge to a greater standard of care because the vessel, for whatever reason, docked at night in dense fog. Captain Leask testified that from his and the pilot's position on the ship's bridge, "even without the fog, I doubt . . . we would have been able to actually have seen the dolphin due to the height of the vessel and the position of the dolphin". R. 681. (See diagram). Moreover, the vessel's negligence is not measured with reference only to what was actually visible to the master or pilot:
 
 
 67
 It is a primary rule of navigation that all moving vessels shall maintain a careful and efficient lookout. The lookout is "both eyes and ears of the ship"; he must be properly stationed on the forward part of the vessel and must be held to a high degree of vigilance in that position. Neither the captain nor the helmsman in the pilot house can be considered to be "lookouts" within the meaning of the maritime law.
 
 
 68
 Dahlmer v. Bay State Dredging & Contracting Co., 26 F.2d 603 (1st Cir. 1928). If the master continues to navigate his vessel knowing that dense smoke or fog will "f event his lookouts from keeping an adequate watch", then he will be held liable for any resulting damage caused by his vessel. Ford Motor Co., supra, 174 F.2d at 195.
 
 
 69
 Here there is no suggestion that the darkness or fog prevented lookouts on the ship's bow from seeing the mooring dolphin. The compulsory harbor pilot testified as follows:
 
 
 70
 And I knew I was coming in slowly at this time. So the next thing I knew, some the mate yelled back to the captain that the catwalk had fell into the river . . . and that's the only information I have about coming into contact with the dock at all. (R. 951)
 
 Captain Leask was more specific:
 
 71
 Q: . . . did you get any reports from the bow as to the position of the vessel during this time?
 
 
 72
 A: We got a report that the ship was approximately 15 feet off the wharf, and then next we got a report that there was something wrong up forward. (R. 590-91)
 
 
 73
 This testimony makes clear that no message of the impending collision was ever relayed. The lookouts on the bow thus failed to exert the "high degree of vigilance" required of them. They were in a position to warn the master about the proximity of the mooring dolphin but failed to do so, thereby violating their legal duty. We repeat that this was an aspect of the vessel's navigation for which the wharfinger cannot be held responsible.
 
 
 74
 The district court's observation that the legal concepts governing the relationship between ships and wharves "must be adjusted to meet the new technology of vessel construction", 396 F.Supp. at 856, may prove in the long run to be accurate. We attempt no such forecast. We rest on the conclusion that this is not the day, and this is not the case, for such adjustment to be undertaken. We adhere instead to the time-honored premise that as between a visible, stationary structure and a moving vessel under the navigation of an expert mariner, the latter is in the superior position to avoid calamity.
 
 V. THE SAFE BERTH CLAUSE
 
 75
 The Furness Bridge has cross-appealed on the issue of whether Bunge was under a contractual duty to provide a completely safe berth. The district court did not expressly decide this issue, but did discuss it in the following terms:
 
 
 76
 Much has been made in briefs about whether, since Bunge subchartered the vessel under a charter party containing a safe berth clause, it had a contractual obligation to provide a secure berth. The clause is in customary terms; it obliges the vessel to discharge cargo "at any wharf or place that Charterers or their Agents may direct, provided the vessel can safely be always afloat at any time or tide." Furness Withy argues that the clause implies a duty by the charterer to furnish a safe berth and imposes liability for its failure to do so, and that Bunge is obligated to Furness Withy by it because the charter to Seabridge contained the same clause. Bunge not only disputes this interpretation of the contract; it contends that, whatever its contractual obligation, the duty was due only to Seabridge; it had no contract with Furness Withy.
 
 
 77
 At least on its face the safe berth (clause) appears merely to exonerate the owner from any duty to berth the vessel at a place its master deems unsafe. There are authorities that read the clause more broadly, and find that it implies a contractual duty to provide a completely safe berth. See, e. g., Venore Transportation Co. v. Oswego Shipping Corp., 2d Cir. 1974, 498 F.2d 469; Paragon Oil Co. v. Republic Tankers, S.A., 2d Cir. 1962, 310 F.2d 169; Park S.S. Co. v. Cities Service Oil Co., 2d Cir. 1951, 188 F.2d 804; Athina Shipping Co. v. Amerada Hess Corp., M.D.Fla.1971, 1972 AMC 796; Universal Tramp Shipping Co. v. Irish Salt Mining Co., D.Mass.1970, 1970 AMC 1783; Red Star Barge Line, Inc. v. Lizza Asphalt Construction Co., E.D.N.Y.1959, 164 F.Supp. 97, aff'd. 2d Cir. 1959, 264 F.2d 467. But some at least take the view that the clause means merely what it says and does not operate to shift to the wharfinger liability that would otherwise attach to the vessel. See Gilmore & Black, The Law of Admiralty § 4-4 at 204 (2d ed. 1975).
 
 
 78
 Under the circumstances of this case these authorities appear not to be controlling. But what is important is that Bunge, being a subcharterer, knew the precise characteristics of the vessel. Bunge also knew of the current in the river, the layers of river fog, the visibility problems encountered in docking at night, and the exact limitations of its wharf. It failed to take all of these factors into account and give the necessary warnings to the master or take other precautions against damage. It has violated a legal duty whether or not it also had a contractual one.
 
 
 79
 396 F.Supp. at 857-58.
 
 
 80
 As we interpret this language, the district court held that the issue of contractual liability was irrelevant in view of its disposition of the case. We affirm the holding, but of course upon a different basis.
 
 
 81
 The parties have cited no case in which this Court has interpreted the customary safe berth clause. The instant case does not afford us the opportunity to hold in favor of either the modern or the traditional view, for we are certain, in the circumstances here present, that the parties could not have intended the safe berth clause, whether by charter party or upon a third party beneficiary theory, to warrant the complete safety of the Bunge wharf. The facility, as it existed at the time when both charter parties were entered into, "was not adequate for vessels the size of the Furness Bridge". 396 F.Supp. at 857. It was "unsafe" only in that it was too small for this vessel. Surely none of the parties who might be bound by or claim protection under the safe berth clause intended that Bunge would either rebuild its entire facility or accept absolute liability by virtue of a boilerplate provision. Under the circumstances, we conclude that there is no contractual liability because of an exception to the safe berth warranty: "When a charter names a port and the master proceeds there without protest, the owner accepts the port as a safe port, and is bound to the conditions that exist there". Pan Cargo Shipping Corp. v. United States, 234 F.Supp. 623, 638 (S.D.N.Y.1964). See also Smith, Jr., Time and Voyage Charters: Safe Port/Safe Berth, 49 Tul.L.Rev. 861, 869-70 (1975).
 
 VI. CONCLUSION
 
 82
 We see no reason to disturb the traditional standard of care to which the wharfinger is held. Whether it be tugs or tankers that come to berth at his dock, the wharfinger remains in the same position in terms of his ability to protect his structure. Those in control of the vessel's navigation must bear the greater responsibility for bringing their ship safely into and out of port. The dock owner's liability should extend only so far as the vessel's master could not have averted an accident, such as where a hidden hazard is or reasonably should be known to the wharfinger and cannot be known to the master in the exercise of ordinary care.
 
 
 83
 In this case, a wharf structurally sound for most ships was deficient for the Furness Bridge, a super tanker. The "defect" was obvious and need not have been the subject of a warning by Bunge. The vessel was under a duty to approach the dock "with reasonable skill and care to avoid injuring it, having in view the difficulties and perils including those caused by the (dock) itself". Sabine Towing & Transportation Co., supra, 297 F.Supp. at 751. (emphasis added). The master and pilot of the Furness Bridge knew that their ship was much longer than the Bunge dock, and knew or should have known that unfendered mooring dolphins lay ahead of the dock, and that special care would be necessary to avoid damage while berthing at this facility. When the vessel commenced its docking maneuver insensitive to these special needs of the situation, and struck a mooring dolphin causing great damage, a classic prima facie case of negligence arose. The vessel failed to produce evidence negating the presumption of negligence or demonstrating contributory negligence by Bunge. Under these circumstances, the vessel was solely liable and damages should not have been divided, but should have been imposed only upon the Furness Bridge and her owner.
 
 
 84
 We have considered the Furness Bridge's claim that Bunge was solely liable by virtue of a contractually assumed duty. We conclude that, regardless of whether the time or voyage charter created an obligation on Bunge's part toward the vessel, the parties did not intend the safe berth clause to shift liability for the pre-existing condition of the wharf.
 
 
 85
 The judgment appealed from is REVERSED and REMANDED as to the main appeal and AFFIRMED as to the cross-appeal.
 
 
 
 *
 This scale drawing is prepared from Exhibits before the trial court
 
 
 [1]
 The record is not clear on this point. See slip 558 F.2d at 799-800, infra
 
 
 [2]
 The vessel in fact redocked the following night, in darkness. Both parties concede that the district court is in error on this point
 
 
 [3]
 Cases in this Circuit (See, e. g. Brown & Root v. Zapata Off-Shore, text, supra ) establish that this presumption affects the burden of proof, not merely the burden of going forward with the evidence. Consequently, we reject the holding of the Third Circuit that when both sides had "fully presented testimony regarding their version as to what happened prior to the collision . . . the presumption disappeared as a matter of law". Pennsylvania Railroad Co. v. S.S. Marie Leonhardt, 320 F.2d 262, 264 (3d Cir. 1963). The Federal Rules of Evidence also reject this "bursting bubble" theory of presumptions. See Fed.R.Evid. 301 and accompanying Notes of Advisory Committee on Proposed Rules
 
 
 [4]
 On cross-examination, the master of the Furness Bridge, Captain Leask, was asked "if there was any condition of that dock that you thought constituted a danger to the ship or to the wharf that was not plainly visible and obvious to you prior to the docking?" The master replied: "No, there was no nothing I knew about that was there". R. 649
 
 
 [5]
 The testimony of the compulsory pilot is less clear on this point but does suggest a lack of concern over whether any mooring dolphins were struck. Although he denied that he was trying to come into contact with dolphin No. 1, the pilot stated, "I was just trying to get the ship alongside the dock, I mean the dock or any portion of the dock, I mean just trying to land land the ship". (R. 955)
 
 
 [6]
 During the docking in question, the vessel was being navigated by a compulsory pilot as required by LSA-R.S. 34:1041 et seq. "The authority of the master of a vessel is not in complete abeyance," however, "while a pilot, who is required by law to be accepted, is in discharge of his functions". Jure v. United Fruit Co., 6 F.2d 6 (5th Cir. 1925). Cf. Chesapeake Bay Bridge and Tunnel District v. Lauritzen, 404 F.2d 1001, 1007 (4th Cir. 1968). In fact, our conclusion as to the respective duties of the parties is strengthened by the presence of the compulsory pilot who must be held to an unusually high standard of care because he "is selected for his personal knowledge of the topography through which he steers his vessel . . . He must . . . be familiar with all dangers that are permanently located in the course of the river . . . All this he must know and remember and avoid". Atlee v. The Nw. Union Packet Co., 88 U.S. (21 Wall.) 389, 396, 22 L.Ed. 619, 621 (1875). See also Petition of M/V Elaine Jones, 480 F.2d 11 (5th Cir. 1973), modified at 513 F.2d 911 (5th Cir. 1975). "(S)uch skillfulness requires a high degree of knowledge predicated on special training and inquiry, and not casual competence". Essex County Electric Co. v. Motor Ship Godafoss, 129 F.Supp. 657, 660 (D.Mass.1955). Thus, absent a finding of actual knowledge, the pilot may be charged with knowledge of a local condition as a matter of law. See General Construction Co. v. Isthmian Lines, Inc., 259 F.Supp. 336, 339 (D.Or.1966). In the instant case, the compulsory pilot was charged with constructive, if not actual, knowledge of the mooring dolphins and the risk they presented. Cf. Standard Dredging Corp. v. S/S Syra, 290 F.Supp. 260 (D.Md.1968)
 
 
 [7]
 The district court did state that "Bunge, being a subcharterer, knew the precise characteristics of the vessel". 396 F.Supp. at 858. While the voyage charter party recited the bare dimensions and weight of the ship, Defendant's Exhibit No. 6, it did not indicate anything as to its maneuverability. The characteristics with which Bunge was familiar were not sufficient to enable it to judge the number of tugs needed in berthing
 
 
 [8]
 Captain Leask testified as follows:
 Q: You thought three was adequate?
 A: Three was adequate, that's right, sir.
 Q: And this was a decision you made?
 A: Yes, sir, I did, and the pilot agreed that this was adequate.
 Q: You talked this over with the pilot at St. Maurice Street?
 A: Yes, on the original docking I did talk this over with the pilot going into St. Maurice Street.
 Q: Did you discuss this with Captain Watson prior to the docking?
 A: Yes, when Captain Watson came on board they already arranged for three tugs by this time.
 Q: And you all were unanimous that three would be enough?
 A: Yes, we were. (R. 651)
 If all the navigational experts involved in docking the Furness Bridge agreed that three tugs would be sufficient, we cannot agree that Bunge, not an expert, was negligent in failing to suggest four.
 
 
 [9]
 Trowbridge, The History, Development, and Characteristics of the Charter Concept, 49 Tul.L.Rev. 743, 753 (1975)
 
 
 [10]
 "Most, if not all, time charters provide that the charterer does not have to pay hire in specific situations whereby time is lost because of failure of the vessel to render service. Such clauses are described as 'off-hire' ". O'Brien, Freight and Charter Hire, 49 Tul.L.Rev. 956, 965 (1975)
 
 
 [11]
 An agent of Bunge informed Captain Leask that "laytime on subject (vessel) ceases . . . at 1430 1/15/74 when (vessel) ordered to berth". Defendant's Exhibit No. 10