**PAN AMERICAN GRAIN MANUFAC-
TURING COMPANY, Plaintiff,**

v.

**PUERTO RICO PORTS AUTHORITY
Defendant.**

**Pan American Grain Manufacturing
Company, Plaintiff,**

v.

**Procesadora de Granos,.
Inc., Defendant.**

**No. CIV. 96–1499(HL),
CIV. 96–1501(HL).**

United States District Court,
D. Puerto Rico.

July 21, 1999.

Antonio Moreda–Toledo, Moreda & Moreda, San Juan, PR, Jose F. Sarraga–Venegas, San Juan, PR, Derek A. Walker, New Orleans, LA, for Pan American Grain Mfg. Co.

Ian P. Carvajal–Zarabozo, Saldana & Carvajal, San Juan, PR, David P. Karcher, Underwood, Karcher & Karcher, Miami, FL, for Puerto Rico Ports Authority.

Dario Rivera–Carrasquillo, Pinto–Lugo & Rivera, San Juan, PR, William P. Kardaras, Cooper, Kardaras & Schars, New York, NY, for Procesadora de Granos.

### OPINION AND ORDER

LAFFITTE, District Judge.

This case came for trial by the Court on March 1–12, 1999. The sole issues to be

resolved at this phase of trial in this admiralty negligence action is the legal responsibility for the casualty of the ship ITB Zorra in Guánica Bay, Puerto Rico on April 24, 1995.

## I. Introduction

The Zorra, an integrated tug and barge or ITB, was a vessel owned by plaintiff and employed in the business of transporting grain on the open seas. While technically two distinct vessels, the tug and barge were operated as one unit, the ITB Zorra.[1] The overall length of the ITB Zorra was 656 feet, and the barge was 85 feet wide. The vessel was powered by two large diesel engines each driving a propeller eighteen feet in diameter weighing 16 tons.

On April 24, 1995, the vessel caught fire and burned in Guánica Harbor after unloading its cargo of grain at the Procesadora de Granos ["Prograns"] berthing facility. The cause of this fire is at the heart of the matter on trial. Plaintiff presented the theory that the vessel's starboard propeller struck an underwater obstruction in the Prograns berth which caused the starboard astern clutch assembly to "slip" along the propeller's drive shaft generating enough heat to start a fire in the engine room. Plaintiff presented factual witnesses and experts to the Court in support of this theory. Defendants presented the alternative theories that the fire started as a result of problems in the ship's fuel lines, or that the clutch caught fire due to excessive shifting rather than any grounding or allision of the vessel. Defendants contend that if any grounding or allision occurred, it occurred through the improper handling of the vessel rather than through fault of defendants.

## II. Findings of Fact

After careful review of the testimony and evidence presented by the parties in this case, the Court finds that, in accord with plaintiff's theory, the fire on the vessel was caused by an allision of the starboard propeller. However, in contrast to plaintiff's contention, this allision took place when the vessel grounded in the shallow waters to the eastern, shoreward, side of the Prograns berthing facility. The narrative of the events of April 24, 1995, as recounted by trial witnesses, presents a vivid picture of the day's events.

In April of 1995, the Zorra called on the Prograns facility in Guanica Bay. The Prograns facility consisted of six large, concrete, "breasting dolphins" aligned North to South for a length of 420 feet, parallel to the shore. Ships using the facility rest alongside these dolphins while loading or unloading their cargo. The Zorra had called on the Prograns facility without incident on seven previous occasions dating from August 1994. The Zorra used two grain elevators, one forward and one aft, for the purpose of discharging cargo. The ship's elevators were separated by a distance of 200 feet. In order for the ship to discharge its cargo of grain, the elevators on the ship need to be aligned with the Prograns facility elevator located in the center of the line of breasting dolphins.

The Zorra approached Guanica Bay on April 22, 1995 after having made a voyage from New Orleans with a stop in San Juan. The vessel was captained by Gerald Williams. Pilot Manuel "Manny" Dos Santos boarded the vessel prior to its arrival at Guanica to assist in maneuvering the vessel safely to the Prograns facility. Dos Santos had piloted the Zorra on numerous occasions, including trips into and out of Guanica Bay. The pilot safely brought the vessel into the Bay and docked it at the Prograns terminal without incident.

On the seven prior occasions it had used the Prograns facility, the vessel had unloaded using the forward elevator first and

1. In this Opinion, the Court may employ terms such as the "ship" or the "vessel" to refer to the integrated unit of tug and barge together.

then the aft elevator. On the occasion at issue, this order of discharge was reversed. The ship was shifted southward along the breasting dolphins with winches in order to align the ship's forward elevator with the Progranos equipment. This shifted alignment caused the stern of the vessel to extend approximately 260 feet beyond the southernmost breasting dolphin ["dolphin # 6"]. The vessel was in this shifted position when it finished unloading on the morning of April 24, 1999, and it was from this shifted position that the pilot and captain elected to commence the undocking procedures rather than having the vessel winched forward. This failure to winch the vessel forward prior to departure left a large portion of the vessel's stern unprotected by the breasting dolphins, this one decision proved to be the critical factor in the events that followed.

The pilot intended to "twist" the vessel's stern to port, out into the bay, to allow room for a tugboat to approach from the starboard, shoreward, side and help push the Zorra out into the channel. The twist maneuver was accomplished by turning the rudders to hard right and running the starboard engine aft while the port engine was set to forward. This would cause the stern of the vessel to move laterally to the West allowing room for the tug to come around and push the vessel the rest of the way into the channel. On this particular morning, the wind was blowing at about 17 knots towards the shore from the Southwest.

According to the pilot's testimony, Tr., Dkt. No. 158, p. 89–95; Dkt. No. 156, 1–59, the assist tug, Oscar, was stationed on the port side of the Zorra as the ship's lines were let go. The tug was in place to keep the ship in place alongside the breasting dolphins until it was ready to maneuver. All of the ship's lines were released except for a line running from the bow of the ship to the third breasting dolphin. This line

was a "spring line" and acted to aid the ship in twisting out and to prevent the ship from moving forward during the maneuver. As the pilot began the twist maneuver, the tug was ordered to stand by until ordered to move around the vessel's stern to the starboard side. After the stern had been opened, the engines were stopped to allow the tug to pass behind the stern on its way to the starboard side without having to cross the dangerous propeller wash of turbulent water created by operating propellers. The tug was ordered to proceed to the starboard side; however, before the tug could take up its position, the wind and the spring line caused the ship to drift back East and rest in a similar position to the one from which it had started. After another attempt at the twist maneuver, the vessel's stern drifted into shallow water east and south of the berthing facility and the vessel ran aground. The Captain and the pilot then decided to reattempt the twist operation and have the tug pull the ship out into the channel by means of a towline. A line was passed from the tug to the stern of the vessel while the engines were engaged. The tug attempted to pull the vessel to the southwest until the line snapped. Another line was passed to the tug which began pulling. At this time the ship was not maneuverable from the bridge because the starboard engine was not functioning properly. The vessel caught fire and was towed into the channel where firefighting efforts were attempted to no avail.

In order to reach the finding that the fire was started when the vessel ran aground in the shallow waters east of the Progranos facility, the Court had to resolve certain conflicts in the testimony. Neither Captain Williams and Pilot Dos Santos testified that the ship crossed the "breasting line" [2] or ever struck bottom. On cross-examination Captain Williams stated that he did not feel any unusual

---

**2.** The breasting line is an imaginary straight line along which the breasting dolphins were aligned and extended beyond the dolphins. It

represents the eastern border of the berthing area.

vibration, and that it was difficult to tell whether the ship had grounded or not, but that he did not believe that it had. Transcript, Dkt. No. 156, p. 140. Pilot Dos Santos stated unequivocally that he never felt any collision or unusual vibration and that the ship never crossed the breasting line. Tr., Dkt. No. 156, pp. 88, 90. However, the Court is unable to fully credit the testimony of these two men in this regard. Both men have a personal and professional interest in propounding the theory that the vessel did not ground on their watch. For this reason, the Court cannot give great weight to the memories of these two men in regards to the grounding which may be tainted, unintentionally or otherwise, by self-interest. In addition to the problem of bias, each man's account of the incident differs from the other in terms of important details. For example, the pilot specifically remembers two attempts at twisting out before a line was passed to the tug. The captain only recounts one prior attempt at twisting. Also, the captain further recalls a loss of maneuverability in the starboard engine and the pilot never mentions any such problem. These inconsistencies, and others, reinforce the Court's determination that the memory of these two men may be unreliable and less than complete.

Instead, the Court finds the testimony of chief mate Bernard Malpass to be highly persuasive. Chief Malpass was on the bridge with the captain and pilot and was manning the ship's throttles during the undocking maneuvers. He testified in an unequivocal and forthright manner about the day's events when called by plaintiff. Mr. Malpass testified that during undocking, he felt a tremendous amount of vibration, sufficient to cause items in the wheelhouse to fall to the floor. Tr., Dkt. No. 159, pp. 129–130. In fact, Mr. Malpass testified that in his thirty years at sea, he had never experienced such a violent vibration. Id. p. 130. At the time of this vibration, Mr. Malpass testified that the ship was close to the dock, within ten or fifteen feet, but that the ship's compass indicated a heading of 340 degrees. Id. According to Mr. Malpass, the dolphin line lay on a heading of 357 or 358 degrees. Id. This difference in angle necessarily means that the ship crossed the breasting line. Also at this time, the spring line tied to the bow of the vessel and originally leading aft had come almost perpendicular to the dock, indicating that the vessel had slid even further south along the dolphins. Id. p. 132. This compass reading along with the ship's position indicated that the ship's stern had crossed the breasting line and entered into the shallows south and east of the berth.[3]

In fact, Mr. Malpass testified that the vibration became progressively worse as the ship moved aft and towards the shore, this is consistent with the finding that the vessel struck ground and debris to the east of the berthing area in charted shallow water. Id. p. 130. In fact, the chart, shows that the water east of the breasting line grows rapidly shallow and to be littered with pilings. Pls. Ex. 101 & 99C. The sea bottom rapidly rises from a safe depth of 28–29 feet up a sharp embankment at 18 and then eventually 12 feet in depth from the water's surface. The chart also clearly shows this very shallow, non-navigable, area to be littered with pilings and submerged dolphins. Id. The vessel had a stipulated draft of 22 feet at the stern, ensuring that if it indeed crossed the breasting line, it necessarily would hit the steep embankment and possibly the pilings marked within it. Malpass stated that the pilot attempted various revolutions, i.e. propeller speeds, to attempt to correct the vibration to no avail; as the ship drifted close enough to shore, and the water became dangerously shallow, the vessel be-

3. One additional witness, the man in charge of handling the ship's lines, testified that the Zorra never crossed the breasting line. The Court gives more weight to the testimony of Mr. Malpass who was engaged in navigating the vessel than to the line handler who may not have been concerned about such matters.

came motionless and would not maneuver at all.

Mr. Malpass also testified that at this time, he overheard the pilot and captain mention the word "aground" in a conversation they were having outside the wheelhouse. He then testified about a brief exchange in which he asked the captain whether the ship was aground and the captain stated "Mr. Mate, no need to worry. The pilot says there is a lot of mud here." *Id.* at 133 Mr. Malpass testified that he interpreted that statement to mean that the ship was on the bottom. He then looked aft and saw confirmation in the form of a tremendous amount of thick, black discoloration in the water which he distinguished from the usual brownish "wash" a buoyant vessel would create in shallow water. *Id.* at 133–34. Finally, according to Mr. Malpass's notations in the ship's "bell book," [4] Pl's Ex. 99A, made the night of the casualty, it was after the ship was aground that the line was passed to the tug to have the vessel towed into the channel. The Court finds that Mr. Malpass's account of the vessel being aground provides the most plausible explanation for why the initial towline snapped, the sheer effort at attempting to move this enormous vessel from the bank in which it had been embedded.

The testimony of Luis Perez serves to corroborate Mr. Malpass's account of a tremendous vibration. Mr. Perez was the vessel's first assistant engineer and had over 55 years of experience at the time of the casualty. Tr., Dkt. No. 159, p.4. Mr. Perez testified that while in the mess room he felt the ship shake and vibrate in a way he had never felt before. *Id.* p. 44. He testified that when he went outside, the tug was putting a line onto the stern of the vessel. *Id.* p.47. Mr. Perez's testimony thus serves to confirm Mr. Malpass's version of events in that there was a major vibration to the ship that occurred before

the tug was enlisted to pull the vessel into the channel.

One more witness solidifies Mr. Malpass's testimony about the ship being aground. This is QMED Frank Browning whose testimony by deposition was accepted by the Court due to Browning's unavailability at trial. Mr. Browning testified in deposition that he heard a loud "thump or a slam." Pl's. Ex. 145, p. 40. Browning was then sent upstairs to investigate the source of this noise. While abovedecks, Browning noticed that there was a lot of mud and discoloration around the stern of the vessel; this and the fact that the vessel was not moving at all led him to conclude that the vessel had run aground. *Id.* at 43.

Plaintiff contends that the vessel struck a submerged piling or group of pilings within the berth and that it was this allision which caused the vessel to lose maneuverability. The Court finds that plaintiff has not met its burden of persuasion on the issue of whether there were obstructions within the berth. Plaintiff presented the testimony of Mr. Jack Mixer, the owner of a diving company hired by plaintiff to inspect the propellers and the berth area. According to Mr. Mixer, there were pilings to the west, or berth side, of the breasting line, and these pilings were of sufficient height to have been struck by the vessel's propeller. He testified that he found two groups of pilings; one 258 feet south of dolphin # 6, and one 273 feet south of the dolphin # 6. *See,* Pl's Ex. 32. He described the group at 258' to be two pile stubs that were jammed into the ground and were inside the berth, 24.2 feet below the surface of the water. Tr., Dkt. No. 163, pp.33–34. He claimed that one of these pilings had a v-shaped cut through which appeared to be fresh, and also claimed to find a piece of piling lying next to the damaged stub with fresh markings on it as well. *Id.* at 62, 88–89, 91–92; Pl's

4. A log in which entries are made indicating engine, rudder, and rigging adjustments dur- ing maneuvers.

Ex. 128. The 273' group were described as two pilings standing 20.4 feet below the surface. Tr., Dkt. No. 163 p. 35. Mixer also described some pieces of wood or fibrous materials that were embedded in the propellers. Tr., Dkt. No. 163, p. 56.

Upon cross-examination, Mr. Mixer's objectivity was seriously called into question by defendants. The Court learned of a longstanding business relationship between Mr. Mixer's dive company and the plaintiff company. Id. at 109–123; Tr., Dkt. No. 169, p. 4. Mixer asked not only to do the investigation of the propellers and berth in relation to the casualty, but he later solicited work in scrapping the destroyed tug and in repairing part of Pan American Grain's facilities in Cataño. Id. and within referred exhibits. The Court finds that through his solicitation letters and because of this business relationship, Mr. Mixer exhibited an eagerness to testify on plaintiff's behalf and a desire for plaintiff's future business. Mr. Mixer's relationship with the plaintiff company and the pecuniary incentives it entails are sufficient to cast a pall over Mr. Mixer's credibility for purposes of this trial, and to cause the Court seriously to discount his claims. Mr. Mixer's eager and rehearsed demeanor on the witness stand confirmed his bias to the Court

Instead, the Court relies more heavily on the testimony of another of plaintiff's witnesses, Mr. Wayne Watson. Watson was hired after the casualty by the Puerto Rico Ports Authority to examine the area and cut any pilings he found to a depth of twenty-eight feet. Tr., Dkt. No. 169, p. 27. In contrast to the testimony of Mixer, Watson found only three pilings. Id., p. 34, 35. He could not recall the exact location of these pilings, specifically whether they were in the berth or east of the breasting line. Id., p. 37. He could not find any piles located in the berthing area at 273 feet south of the last breasting dolphin, the ones which Mixer claimed to have seen. Id., p. 35. The pilings Watson did find, were pushed at an angle into an underwater embankment. Mr. Watson stated that it appeared as if they had been pushed into the embankment after a collision with a ship. Id., p.42.

Mr. Watson's testimony, taken together with Mr. Malpass's testimony about the ship crossing the breasting line strongly indicates to the Court that the ship ran aground on the sloping embankment east of the berth. Mr. Watson could not recall whether there had been any damage to these pilings other than their having been pushed into the embankment. Id., at 44.

There is strong reinforcement for this conclusion, the existence of a large trench cut into the embankment. One of Mixer's divers, Gordon Welch, was called as a defense witness. Mr. Welch testified that he saw a large trench cut into the embankment east of the breasting line. Tr., Dkt. No. 175, p. 63. The bank rose from the sea floor at a forty-degree angle and had a large trench gouged out of it starting at fourteen feet of depth and continuing to the bottom of the trench at 25 feet. Id. at 64, 65. The embankment and trench were fifteen feet east of the breasting line. Id. The location of this trench in the embankment east of the breasting line, together with Watson's discovery of pilings embedded in the embankment and the chief mate's testimony that the ship crossed the breasting line leads the Court to its ultimate conclusion. The ship's stern crossed the breasting line, ran aground on the bank and its propellers were stopped or slowed by coming into contact with the bank itself or the pilings embedded in it.

Finally, that part of the pilings which protruded above the muddy bottom were in a deteriorated state unlikely to have caused any damage to the ship's massive propellers. Another of Mixer's divers, Javier Marrero testified that he accidently broke off a two foot long piece of piling with his hands during an investigatory dive. Tr., Dkt. No. 175, p. 86. Mr. Watson also testified and identified pictures showing that the portions of the pilings above the "mudline" were thinner and

more deteriorated then those portions buried in the ground. TR., Dkt. No. 169, pp. 71–73. Indeed, if a diver was able to break one of pilings with his hands, it seems hard to imagine that these rotten pilings would pose a threat to a sixteen ton propeller. This evidence then further leads the Court to conclude that if the propeller was in fact damaged by pilings, it was necessarily by pilings embedded in the shallow bottom where they were protected from the erosion of water and sea life and remained strong.[5] Therefore, the vessel must have hit these pilings below the "mudline" of the seabed in the process of grounding on the embankment.

Therefore, The most likely scenario presented by all of the testimony and evidence is that the vessel ran aground, and that this grounding then caused the fire aboard the vessel, either by causing the clutches to overheat in accord with the theories of plaintiff's experts Vorus, Hilpert, and Demers, or by causing the fuel system to rupture due to the tremendous vibration. The preponderance of the evidence clearly points to a clutch fire, but the actual, technical reason the fire ignited in the engine room, be it an incandescent clutch pad or a leaking fuel pump, is ultimately of little significance. The crux of this case is causation, i.e. whether the defendants are responsible for the vessel's grounding, a matter to which the Court now turns its attention.

### III. *Conclusions of Law*

Plaintiffs stake their legal claims for relief on two separate theories. First, plaintiffs claim that the defendants did not meet their duty of keeping the berth clear of obstructions. Second, they claim that the berth was undersized for the vessel and that the vessel should never have been permitted to dock at the facility. The Court shall address each of these legal theories in turn.

■ It is clear that under the law, PRPA and Progranos, were both wharfingers, i.e. parties responsible for maintaining the berth at the Progranos facility. PRPA owned the facility while Progranos held a leasehold interest in the property and was under a contractual duty to maintain it. There is a long-recognized duty imposed upon wharfingers that they exercise reasonable diligence in determining the safety of their berth, "and if there is any dangerous obstruction to remove it, or to give notice of its existence to vessels about to use the berths." *Smith v. Burnett*, 173 U.S. 430, 435–36, 19 S.Ct. 442, 43 L.Ed. 756 (1899)(citing the British case, *The Calliope*, C.A. 11 (1891)); *Bangor & A.R. Co. v. Ship Fernview*, 455 F.Supp. 1043, 1061 (1978). The duty to warn of obstructions extends only to hidden hazards not reasonably known to the shipowner. *Id.* at 1062 (citing *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790 (5th Cir. 1977)).

■ In the case at hand, the Court found that the Zorra struck either pilings or the embankment east of the berthing line in an area that showed shallow water and pilings on the official navigational charts. These hazards were well-known and outside of normal areas of navigation. Additionally, these pilings were so far south as to have been in an area not ordinarily used for navigation. The pilot knew or should have known of the existence; and therefore, the allision was not due to a breach of the wharfinger's duty to remove or warn of obstructions.

■ Plaintiff urges the court to apply a burden shifting standard known as the

---

**5.** There was controversy surrounding whether or not a small, two inch, piece of wood had been recovered from the propeller blade. Jack Mixer claimed to have seen it and Mr. Marrero claimed that it never existed. There was conflicting evidence and testimony about whether the Coast Guard had ever received this piece of wood. Ultimately, however, whether a small piece of wood encrusted in the propeller is of little relevance. If there was such a piece of wood, it more likely than not came from the pilings or debris in the shallow embankment and is therefore not the "smoking gun" it may have once appeared.

Pennsylvania Rule after the case in which it was first expounded, *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 134, 22 L.Ed. 148 (1873). Under that rule, a vessel, or a wharfinger, who fails to comply with a statutory duty has the burden to prove that its breach not only might not, but could not, have contributed to the casualty. *See, Jones v. Spentonbush–Red Star Co.,* 155 F.3d 587, 594 (2nd Cir.1998). Plaintiff alleges that defendants violated 33 U.S.C.A. § 403 (West 1986), a statute which prevents the creation of any unauthorized obstruction to U.S. navigable waters. Plaintiff contends that in light of defendants' violation of § 403, the defendants are subject to the burden shift of the Pennsylvania Rule.

■ This argument is unpersuasive. Section 403 is inapplicable to the facts of the case at hand. At most, it is alleged that defendants failed to maintain their berth by not removing existing obstructions. It is not alleged that defendants created a new obstruction to U.S. waters that would constitute a violation of § 403. There are cases demonstrating that abandoned piers and a collapsed dock have been considered obstructions to navigable waters. *Norfolk & Western Co. v. United States* 641 F.2d 1201 (6th Cir.1980)(collapsed dock had impeded navigable capacity of the Huron River and was therefore deemed an obstruction); *United States v. Illinois Terminal R. Co.,* 501 F.Supp. 18 (D.Mo.1980)(decaying remains of an abandoned bridge, although lawfully constructed might still be considered an obstruction for purposes of § 403). However, these cases deal with objects found in areas of navigation. In this case, the piles were found outside the normal areas of navigation, well to the south of the Progranos facility. As such, they did not constitute an impediment to navigation for vessels using ordinary care to avoid danger. The Court acknowledges that the term "obstruction" as used by the statute is to be liberally construed in favor of open waterways. *See, United States v. Republic Steel*

*Corp.,* 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960); *Norfolk,* 641 F.2d at 1210. However, a liberal construction applied to the facts at hand yields the same result. The Court concludes that the defendants have not violated any statutory duty contained in § 403; in so concluding, the Court declines to apply the burden-shifting standard of the Pennsylvania Rule to this case.

■ Defendants did not violate their duty as wharfingers regarding the pilings, but plaintiff further contends that defendants were responsible for allowing the oversized Zorra to berth at the facility. Plaintiff contends that the wharf's design limitation was not open and obvious to the vessel's captain and pilot. This argument misses the mark as well. It is true that the Progranos facility was designed for vessels smaller than the Zorra, to a maximum of 420 feet in length. The Zorra was 656 feet long. It would have been obvious to the shipowner, pilot, and captain that the vessel would protrude beyond the ends of the protective dolphins. This was not a hidden danger. In fact, when the vessel was winched back as it was on the date of the casualty, its stern extended 260 feet beyond the last breasting dolphin. This left it virtually unprotected from drifting into the shallows once all of the lines were released. This danger which would have been apparent to anyone, let alone seamen with the experience of Dos Santos and Captain Williams, is precisely what caused the Zorra to run aground. On seven prior occasions, there were no difficulties because the vessel undocked from a position more centrally aligned with the breasting dolphins. On the one occasion that the vessel's masters decided to undock from a shifted, unprotected, position rather than simply winching the ship forward, the accident occurs. When the vessel cut its engines during the twist maneuver to allow the tug to pass astern, the wind or other currents caused it to move west across the breasting line and south into the area charted with pilings and shallows. This

would never have happened had the vessel been shifted forward prior to departure because the breasting dolphins, used properly as in the past, would have prevented precisely this kind of mishap.

In *Bunge v. M/V Furness Bridge*, 558 F.2d 790 (5th Cir.1977), a 965 foot vessel attempted to berth at a 470 foot wharf and in doing so caused damage to a mooring dolphin. The Fifth Circuit found that the masters of the vessel "must be charged as a matter of law with knowledge of the comparative sizes of their vessel and the ... wharf." *Id.* at 797. In this case, the same analysis obtains. It was open and obvious to the pilot, who had maneuvered this same ship into and out of this same facility on several previous occasions that the wharf was significantly smaller than the vessel. There was nothing about which Progranos or PRPA "should have warned the plaintiff that the plaintiff did not already know or that was not solely within the master's navigational responsibilities." *Id.* at 796. The cause of the casualty was not the vessel's excess over the designed capacity of the wharf, but rather the pilot's handling of the vessel in light of the obvious fact that it outsized the facility.

In fact, even if the pilings were found west of the breasting line, and the Court concludes that they were not, this error on behalf of the vessel's master constitutes proximate cause for the casualty. In other words, the dangers of this maneuver from a southerly shifted position should have been easily forseeable to the pilot and captain who chose to attempt it.

WHEREFORE, the Court concludes that the casualty of the ITB Zorra was an accident which could only have been prevented by the pilot and captain of the vessel. The berth and wharfing area were not maintained or operated in an unsafe or negligent manner. Had the pilot ordered the vessel to be winched forward prior to departure, the stern of the vessel would not have been exposed to the charted dangers of pilings and shallows south of the

dolphins and east of the breasting line. It was the failure to take precaution which allowed the wind or currents to cause the ship to drift into the shore when the initial twisting maneuver was unsuccessful. The rest of the events flowed from this unfortunate mistake rather than from any negligence on behalf of defendants. Judgment shall be entered accordingly.