**SEACARRIERS MARITIME CO. and Westwind Africa Line, Ltd.**

v.

**M/T STOLT JADE, etc.**

**Civ. A. Nos. 92–832, 92–965.**

United States District Court,
E.D. Louisiana.

June 16, 1993.

John Roumain Peters, Jr., Patrick Joseph Veters, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, for Texaco Exploration and Production, Inc., plaintiffs.

Robert Burns Fisher, Jr., Joseph Dwight LeBlanc, Jr., Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, LA, for MV Gulfwind, her engines, tackle, apparel, furniture, etc., in rem, Seacarriers Maritime Co., Ltd. and Westwind Africa Line, Ltd. in personam.

## OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This matter came before the Court on April 22, 1993 as a bench trial on the issue of liability. To the extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

These consolidated cases involve a collision in the Gulf of Mexico between the M/V Gulfwind, owned by Seacarriers Maritime Company ("Seacarriers") and time chartered by Westwind Africa Line Limited ("Westwind"), and the West Delta 109–A Oil and Gas Platform, owned and operated by Texaco Exploration and Production, Inc. ("Texaco"). Both the vessel and platform were damaged as a result of the collision.

Seacarriers and Westwind filed suit against the M/V Stolt Jade, in rem, and against its owner, Stolt Jade, Inc, in personam. In their complaint, Seacarriers and Westwind allege that, although the Stolt Jade was not involved in the actual collision, it contributed to the casualty by embarrassing the navigation of the Gulfwind. Texaco filed suit against the M/V Gulfwind, in rem, and against Seacarriers and Westwind, in

personam. The cases were consolidated, and the Court bifurcated trial between the issues of liability and damages.

The M/V Gulfwind, a Greek Flag bulk carrier, is 607 feet in length, 97 feet in breadth, and 23,646 gross tons. The vessel is powered by a diesel engine of 13,050 brake horsepower, geared to a single right-hand turning propeller. On March 4, 1992, the Gulfwind discharged a load of bauxite material ore in Corpus Christi, Texas. The vessel then proceeded to New Orleans, in ballast, with three drafts of 3.9 meters forward, 5.25 meters mean, and 6.5 aft.

On March 5, 1993, at approximately 1800 hours, the Gulfwind approached the safety fairway leading to the head of passes on the Mississippi River after an uneventful voyage in moderate weather. The fairway begins below the Southwest Pass of the Mississippi River and extends into the Gulf of Mexico. It provides vessels with a secure route of passage between fixed oil and gas platforms located in the Gulf. From the sea buoy demarcating the end of the Southwest Pass, the fairway continues for approximately three miles and then forks, forming an inverted "Y", with one branch extending southeast and the other southwest.[1] Use of the fairway is purely voluntary. As it approached the southwestern leg of the fairway, the Gulfwind's master, Captain Konstandinos Bazigos, ordered the vessel to proceed in a north-easterly direction at full ahead sea speed on a course of 38° true. The Gulfwind's second officer, Konstandinos Keriakou, testified that, after the course was set, the Gulfwind was placed on automatic steering.

Between 1900 hours and 2000 hours, the weather in the Gulf deteriorated. The National Weather Service recorded winds peaking at 16.8 knots at 1900 hours and increasing to 24.5 knots at 2000 hours.[2] Over the next two hours, wind speeds continued to increase reaching top speeds of at least 31.4 knots, with gusts of 40 to 60 miles per hour, visibility varied from zero to three miles, and the seas rose between eight and ten feet.[3] The Gulfwind's master and officers were aware that poor weather had been predicted for the area.[4] The Gulfwind, however, was left in light ballast with an exposed freeboard exceeding thirty feet. Moreover, the Gulfwind's master failed to assign a lookout to watch for oncoming traffic or structures.

As the Gulfwind proceeded into the southwest leg of the fairway, the Stolt Jade, a Liberian flag parcel tanker, was being piloted to the Gulf through the Southwest Pass of the Mississippi River. The Stolt Jade is 580 feet in length, 105 feet in breadth, and 23,964 gross tons. The vessel departed heavily laden from New Orleans earlier in the day with an intended destination of Panama. Her drafts at the time of departure were 11.25 meters forward and 12 meters aft.

The Stolt Jade arrived in Pilottown, Louisiana at approximately 1920 hours after an uneventful voyage down the Mississippi. Bar Pilot Albro Michell, Jr. relieved the river pilot, and the vessel proceeded through the Southwest Pass.[5] The bar pilots' logs reflect

---

1. The southwest leg of the fairway runs on a northeast axis of 217°/037° True, while the southeast leg runs on a southeast/northwest axis of 148°/328° True.

2. *See* Stolt Jade Exhibit No. 20.

3. Although estimates of the prevailing conditions varied, all witnesses described the night in question as stormy and treacherous. The Coast Guard reported that "weather conditions were not conducive to normal travel speeds. It was raining very hard, limiting visibility to less than a mile, with eight to ten foot seas and thirty knot winds." *See* United States Coast Guard Incident Investigation Report, Stolt Jade Exhibit No. 5.

4. Earlier in the day, the Gulfwind had received two weather reports which indicated that scattered showers and thunderstorms were develop-

ing in the Gulf as a low pressure system moved off the coast of Texas. The Gulfwind's navigators were also familiar with volume five of the *United States Coast Pilot*, a Government navigation manual, which warns vessels that passing cold fronts producing strong northerly winds should be expected in the Gulf through March. The *Coast Pilot* further cautions navigators to expect to encounter a strong current, setting westerly, as vessels approach the Southwest Pass.

5. In a post trial memorandum, the Gulfwind interests attempt to call into question the credibility of Pilot Michell. The Court, however, finds the Gulfwind's arguments unpersuasive. Pilot Michell's testimony was consistent with the testimony of other non-interested witnesses and the Court credits his testimony accordingly.

that the Stolt Jade was the only vessel outbound between 2050 and 2200 hours on March 5, 1993. As the Stolt Jade approached the Southwest Pass sea buoy, Pilot Michell made arrangements with Tim Flynn, the pilot of an inbound vessel, the Hoegh Clipper, to pass port to port. Pilot Michell testified that the vessels passed without difficulty shortly after 2050 hours at a distance of one-quarter to one-third of mile. The Stolt Jade's first officer, Javier Naudy, testified that the Stolt Jade could comfortably pass another vessel at a distance as close as one-tenth of a mile.

After passing the Hoegh Clipper, Pilot Michell directed the Stolt Jade past the east side of the Southwest Pass sea buoy and reduced speed, coming to a southwesterly course of 220° true. Pilot Michell left the Stolt Jade while it was in the middle of the fairway and disembarked onto a waiting pilot boat, the Sea Pilot.[6] The Stolt Jade set a course of due south at 2105 hours. Between 2105 hours and 2110 hours, the Stolt Jade, because of the prevailing set to the west, drifted to the western half of the fairway. Between 2110 hours and 2120 hours, the Stolt Jade maintained a southerly heading as the vessel's speed increased to approximately 12 knots. At 2120 hours, the Stolt Jade passed Texaco's West Delta 109-A Oil and Gas Platform .5-.75 miles to the starboard.[7] Throughout this time, the Stolt Jade's helmsman steered the vessel by hand.

As the Stolt Jade traveled south through the fairway, the vessel displayed customary navigation lights, including a white masthead light, a white range light, a white sternlight, a red port light, and a green starboard light. Two radios on the bridge were monitored at channel sixteen VHF. The Stolt Jade's master testified he heard no transmissions over the radio except for a transmission, at approximately 2115 hours, from an unidentified vessel claiming to have engine trouble.[8] The transmitting vessel did not identify itself or its whereabouts. Two radars, one set at three miles and one set at six miles, were also in use aboard the Stolt Jade as she proceeded through the fairway. The vessel's Automatic Radar Plotting Aid ("ARPA") was operational and set at 1.5 miles.[9] The only target noted on the Stolt Jade's radar was Texaco's Oil and Gas Platform.[10] The Stolt Jade maintained a lookout on the starboard bridge wing of the vessel. The lookout did not see any other vessels or warning lights or hear any horn blasts.

Texaco's West Delta 109-A Platform lies at the western corner of the fairway's southwest leg bifurcation. It is one of the principal navigation aids for vessels making land fall at the Southwest Pass. The platform is outfitted with a "RACON" device, which is maintained by the Coast Guard. The RACON device broadcasts a special signal visible on every passing ship's radar screen. The platform is also outfitted with a radar deflector on its Southeast corner, four double stacked white navigation lights on each corner, and at least three hundred other lights positioned throughout the platform. During

6. The Sea Pilot stayed alongside the Stolt Jade for approximately eight minutes, but fell behind as the Stolt Jade's speed increased. Captain Victor Mesa, Pilot Michell, and Pilot James Flynn were all aboard the Sea Pilot. All three testified that, shortly before the collision, the Gulfwind appeared to be on a course directly in line with the Texaco platform. All three further testified that the Stolt Jade presented no risk of collision to the Gulfwind.

7. The Gulfwind's crew places the Stolt Jade at a distance of .5 miles, the Stolt Jade's crew places the vessel at a distance of at least .6 miles, the pilots aboard placed the vessel at a distance of at least 1 mile, the 2120 radar plot on Stolt Jade's navigation chart reflects a distance close to .75 miles between the vessel and the platform. The pilots' positioning some distance to the northwest of the Stolt Jade and their low visibility

causes the Court to discount their assessment of the distance.

8. Due to language differences aboard the various vessels, the Captain may very well have confused this call with a mayday call issued by the captain of the Gulfwind after she collided with Texaco's platform.

9. According to her captain, when the Stolt Jade came within 1.5 miles of Texaco's West Delta 109-A Oil and Gas Platform, the ARPA alarm sounded.

10. In all likelihood the Gulfwind's absence from the radar screen of the Stolt Jade resulted from the close proximity of the Gulfwind to the Texaco platform and the presence of clutter due to the thunderstorms in the area.

trial, witnesses stated more than once that the platform is "lit up like a city" against an otherwise dark horizon. On March 5, 1992, all navigational aides as well as the RACON device and radar deflector were fully operational and working.

At 2100 hours, the Gulfwind was hit with a rain squall reducing visibility to almost zero. Second Officer Keriakou contacted the Southwest Pass pilot station to report a revised estimated time of arrival at the Southwest Pass sea buoy. Second Officer Keriakou then fixed the vessel's position by radar, which indicated that the Gulfwind was proceeding up the fairway on its western edge.[11] Keriakou testified that, at this time, the Gulfwind was approximately three to four miles southwest of the Texaco platform. In an effort to bring his vessel to the middle of the fairway, Captain Bazigos ordered the Gulfwind to proceed on a course of 048° true. Captain Bazigos then reduced the vessel's speed from full ahead sea speed to full ahead harbor speed.

Meanwhile, the Stolt Jade, which Captain Bazigos recognized on radar as an outbound vessel at a distance of 4.7 miles, was approaching the Gulfwind from the north-east. Despite the poor weather conditions and vessel traffic, Captain Bazigos ordered the Gulfwind's ARPA system turned off. Neither Captain Bazigos nor his crew performed any further radar plots of the Gulfwind's position or the position any other vessel or structure until after the collision.

At 2108 hours, Captain Bazigos reduced the Gulfwind's speed to half ahead due to the bad weather, to pick up the pilot, and to determine whether the Gulfwind's engines were working properly.[12] At 2110 hours, concern over the course of the outbound Stolt Jade prompted Captain Bazigos to attempt to bring the Gulfwind on a heading that would bring it between the Stolt Jade and Texaco's platform. A visual sighting had not yet been made, but the Gulfwind's radar indicated that the Stolt Jade was approximately a mile and a half to the north-east of the Gulfwind. Captain Bazigos ordered the Gulfwind to turn to port on a heading of 025° true. On Captain Bazigos' order, the Gulfwind's speed was reduced for a second time to slow ahead.

Meanwhile, Captain Bazigos ordered Second Officer Keriakou to radio the Stolt Jade and then signal her with a flashlight and whistle. According to Keriakou, a radio call was made on Channel 16 VHF at 2110 hours and then again at 2114 hours. However, no radio communication was accomplished with the Stolt Jade. The evidence indicates that the Gulfwind failed to make radio contact with the Stolt Jade because the Gulfwind was communicating on channel 9 VHF, which is reserved for pilot to ship communications, rather than on channel 16 VHF, which is reserved for bridge to bridge communications.[13] Keriakou also testified that he at-

11. The testimony of the pilots aboard the Sea Pilot indicated that the Gulfwind was somewhat farther to the west than admitted by the Gulfwind interests. Each pilot testified that the Gulfwind was either on the outside of the fairway or on its western most edge.

12. The Court notes that the deposition testimony of Captain Bazigos contradicts and is one of many factors, more fully explained *infra* note 14, that has caused the Court to question the testimony of Second Officer Keriakou. In an apparent effort to cast the his conduct and the conduct of Captain Bazigos in the best light, Keriakou testified that the 2108 hours change in speed was prompted by the Captain's concern over a collision with the outbound vessel. He further testified that the speed reduction was specifically meant to alter the time at which the Gulfwind and Stolt Jade would cross paths. Captain Bazigos' testimony fails, in any way, to support this version of the facts.

13. The Gulfwind's attempted communication with the Stolt Jade was heard at the pilot house by Skelly Seahaufer, aboard the Sea Pilot by Captain Albro Michell, Jr. and the intended pilot for the Gulfwind, James Flynn, and aboard the Hoegh Clipper by Pilot Tim Flynn, Jr. Both Skelly Seahaufer and Tim Flynn, Jr. were listening to both channels 9 and 16 VHF. Neither could state with any certainty whether the transmission came over channel 9 or 16. On the other hand, Albro Michell and James Flynn were listening to only channel 9 VHF when they heard the transmissions. Moreover, the captain of the Vivian II, Mike Dikinson, which was positioned west of the mouth of the Mississippi, testified that he had been listening to only channel 16 throughout the evening and that no transmissions from the Gulfwind were heard, except for its may day call. Lending further support to the Court's conclusion is the testimony of Captain Michell in which he indicated that he was forced to notify Captain Bazigos that his post-collision

tempted to signal the Stolt Jade with a light, but conceded that visibility was extremely poor.

At 2112 hours, Captain Bazigos and Second Officer Keriakou made their first visual sighting of the Stolt Jade at a distance of approximately .8 miles. By this time, Captain Bazigos had overcompensated in his effort to position the Gulfwind in the fairway between the Stolt Jade and the Texaco Platform. In an apparent effort to correct the vessel's course, Captain Bazigos ordered the Gulfwind to turn starboard 014° true and proceed full speed ahead. However, the Gulfwind was now only .3 miles from Texaco's platform and drifting west.

Over the next two minutes, Captain Bazigos recognized that the Gulfwind was dangerously close to the Texaco platform and called the chief engineer of the Gulfwind to order emergency revolutions. Captain Bazigos testified that, despite his order, the wind and current continued to push the Gulfwind towards the Texaco platform. Moreover, Second Officer Keriakou conceded that, although the vessel was not experiencing steering or mechanical difficulties, the vessel was not receiving full emergency power because its rudder was exposed in the troughs of the waves due to its light condition. Keriakou further conceded during cross examination

that the Gulfwind should have been in heavy ballast due to the heavy weather and that its light condition made it vulnerable to the wind.

Between 2114 hours and 2115 hours, Captain Bazigos ordered the Gulfwind's rudder hard starboard. This order, however, was made in vain as a collision was now imminent and inevitable. Captain Bazigos and Second Officer Keriakou contend that the Gulfwind's engines were shut down thirty seconds before the collision. These two further contend that the collision did not take place until 2118 hours.[14] Finally, at trial, Keriakou testified that the Gulfwind sounded whistles to warn the platform of the impending collision.[15]

The evidence, when viewed in its entirety, fails to support the Gulfwind interests' contention that the Stolt Jade embarrassed its navigation. The Court concludes that between 2115 hours and 2118 hours the Gulfwind collided with the southeastern leg of the Texaco platform just after mid-ship on its port side. The Court further concludes that at the time of the collision the Stolt Jade was at least .5 miles to the east and some distance to the north of the platform and that at no time did the Stolt Jade's position or projected course present a visual crossing situation with the Gulfwind. To the contrary, the

mayday had to be transmitted over channel 16 and would not be heard by the Coast Guard if he continued to transmit over channel 9 VHF.

**14.** The Court finds that the aforementioned testimony of Captain Bazigos and Keriakou lacks credibility. The original entry in the Gulfwind's log indicated that the Gulfwind collided with the Texaco platform at 2115 hours. Keriakou explained that this entry had been erased by the Captain. He further explained that the notation was meant to indicate that at 2115 hours the Gulfwind turned hard right rudder. The Court finds this explanation suspect as the only erasure in the log at the notation for the time of collision was the changing of the number "5" to the number "8".

The Court notes that the deposition testimony of other crew members aboard the Gulfwind further calls into question the accuracy of the Gulfwind interests' contentions concerning the time of collision. For example, the Gulfwind's chief engineer, George Haratsis, after prompting by counsel, disputed the accuracy of records maintained in the Gulfwind's engine room with respect to the times at which certain orders were

received from the bridge. *See* Deposition of George Haratsis taken on March 20, 1992. Similarly, Georgios Kamitsos, the Gulfwind's electrician, testified that the engine room records were inaccurate. *See* Deposition of Georgios Kamitsos taken on March 20, 1992. Moreover, the testimony of Haratsis and Kamitsos cannot be relied upon because of Gulfwind counsel's attempt to re-create the accident for both witnesses through the use of leading questions during direct examination.

As will be seen, the exact time of collision is not important under the facts of this case for the purpose of assessing liability. Accordingly, the Court has disregarded the bantering between the parties over whose clock had the correct time.

**15.** The reliability of Keriakou's testimony is further called into doubt by this statement as it was contradicted by Captain Bazigos. In his deposition testimony, Captain Bazigos stated that no warning whistles were sounded immediately prior to the collision. This portion of the Captain's testimony was verified at trial by three Texaco employees aboard the platform at the time of collision; none of whom heard any horn blasts.

evidence demonstrates that the collision between the Gulfwind and Texaco's platform resulted solely from Captain Bazigos' poor seamanship as exemplified by his failure to maintain a look out, properly consider the effect of the weather and westerly current on a vessel in light ballast with an exposed freeboard exceeding thirty feet, and to make proper use of the Gulfwind's radar equipment.[16]

## CONCLUSIONS OF LAW

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, and venue is properly laid in the Eastern District of Louisiana. All parties in this case agree that the International Regulations for Preventing Collisions at Sea[17] ("COLREGS") governed the conduct of the vessels while they were in the fairway.[18]

■ There is a presumption of fault against a moving vessel that collides with a stationary object.[19] Although the presumption is not absolute, it "does more than merely require the ship to go forward and produce some evidence on the presumptive matter. The moving vessel must show that it was without fault or that the collision was occasioned by fault of the stationary object or was the result of inevitable accident."[20] In other words, the presumption may only be overcome if the moving vessel demonstrates that the collision was caused by an act of God, the negligence of a third party, or the fault of the stationary object. Taking full advantage of the alternative pleading provisions of the Federal Rules of Civil Procedure, the Gulfwind interests have invoked all three defenses.

## I. FAULT OF THE STATIONARY OBJECT

■ Although the Gulfwind interests initially alleged fault on the part of Texaco for placing its platform outside the western edge of the fairway, they abandoned this defense at trial by failing to offer evidence in support of this contention. To the extent any such defense still exists, the Court finds that it has no merit. Texaco was under no obligation to place its platform in a location other than the western edge of the fairway merely because vessels find it convenient to use the fairway in their approach to the Southwest Pass. As another court in this District once explained,

> The two-mile-wide fairway, which lies in the open waters of the Gulf of Mexico, is simply not a narrow channel. The fairway is part of a system established to provide shipping lanes free of oil structures. The fairway does not constitute a designated traffic scheme and its use is entirely voluntary. Vessels using the fairway do not acquire any special rights nor do their obligations under the [COLREGS] change.[21]

On the night of the collision, Texaco's platform was properly permitted, well-lit, and served an important function as a navigation beacon for vessels in the Gulf of Mexico. Accordingly, it bears no fault in this matter.

## II. INEVITABLE ACCIDENT

■ Likewise, the Court has no difficulty in concluding that the collision between the Gulfwind and Texaco's platform cannot be attributed to an act of God. Forecasters predicted the weather conditions prevailing at the time the Gulfwind entered the fairway. Moreover, the weather conditions were not unusual for the area or time of year, and the Gulfwind and her crew knew that poor

---

**16.** It is relevant to note that the Gulfwind had come dangerously close to colliding with the Texaco platform on a prior occasion. Mark Russell, an engineer aboard the Texaco platform, testified that two months before the collision the Gulfwind came within 150 yards of the Texaco platform. Russell further testified that this was highly unusual as most vessels maintain a one mile berth while passing the platform.

**17.** *See* 33 U.S.C. § 1602.

**18.** *See Zim Israel Navigation Co. v. Special Carriers, Inc.,* 611 F.Supp. 581, 586 (E.D.La.1985).

**19.** *See The Oregon,* 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895); *Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790, 794–95 (5th Cir.1977).

**20.** *Id.* at 795; *see Cliffs–Neddrill Turnkey v. M/T Rich,* 947 F.2d 83, 86 (3rd Cir.1991).

**21.** *Special Carriers,* 611 F.Supp. at 587.

weather had been predicted. Nevertheless, the Gulfwind was left in light ballast with a large portion of her freeboard exposed. Consequently, her maneuverability and power were diminished as the current pushed her to the west and her propeller turned futilely in the air as she fell in the troughs of the high seas. As admitted at trial by the Gulfwind's second officer, reasonable foresight should have led the captain to order the vessel into heavy ballast once the weather forecasts had been received.[22] If this course of action had been taken, the Gulfwind's attempt to pass between the Stolt Jade and Texaco's platform would have in all probability proceeded without incident. In short, the Gulfwind did not display the reasonable care required, under the circumstances, to invoke the inevitable accident defense.[23]

## III. FAULT OF A THIRD PARTY

The Gulfwind interests' attempt to cast liability on the Stolt Jade requires more extensive discussion. The Gulfwind interests argue that the Stolt Jade presented an embarrassment to the navigation of the Gulfwind. Specifically, the Gulfwind interests contend that a crossing situation existed between the Gulfwind and the Stolt Jade, the Stolt Jade was the burdened vessel, and the Stolt Jade failed in its duty to give way to the Gulfwind. They further argue that the Stolt Jade is at least partially at fault because its crew violated the COLREGS and principles of good seamanship by failing to maintain a proper visual lookout, to maintain proper radar observation, to monitor the VHF radio, to position herself on the eastern side of the fairway, and to proceed at a speed appropriate to the prevailing weather conditions. The Stolt Jade interests, on the other hand, contend that a crossing situation did not exist because the vessels were not in sight of one another while the Gulfwind was on a crossing course with the Stolt Jade, the Stolt Jade complied with its duties under the COLREGS, and the collision resulted from the poor seamanship of the Gulfwind's captain and its crew.

■ Whether the Stolt Jade had a duty to give way to the Gulfwind depends on whether a visual crossing situation, as defined by the COLREGS, existed at any time prior to the collision. The Gulfwind interests contend that the Stolt Jade became a burdened vessel with a duty to give way when the Gulfwind appeared or should reasonably have been expected to appear on its radar, which is presumably the same time the Stolt Jade appeared on the Gulfwind's radar. The Court disagrees.

Under Rule 15 of the COLREGS, a vessel becomes burdened to give way in a crossing situation when the two vessels are in sight of one another. Two vessels are in sight of one another *"only* when one can be observed *visually* from the other."[24] The Stolt Jade was thus under no obligation to give way to the Gulfwind until the vessels were within visual sight of each other. According to the testimony of Gulfwind's master and second officer, the Stolt Jade came within visual sight of the Gulfwind when they were separated by a distance of .8 miles. By this time, the Gulfwind's course had taken her to a position bearing north between the Stolt Jade and the Texaco platform. Under these circumstances, a crossing situation did not exist, and the Stolt Jade was not burdened to give way.

■ In the alternative, the Gulfwind interests argue that the Stolt Jade contributed to the collision by failing to abide by the fundamental principles of good seamanship. The Stolt Jade interests vigorously disputed this contention at trial. After reviewing the evidence and testimony of the witnesses, the Court finds that the Stolt Jade's conduct did not in any way contribute to the collision of the Gulfwind with Texaco's platform.

Initially, the Court finds that there was simply no clear proof at trial to suggest that the Stolt Jade neglected its duty to maintain a proper visual lookout, to maintain proper

---

**22.** The Gulfwind received its first weather report at approximately 1410 hours which provided it with sufficient opportunity to complete the procedure necessary to take the vessel into heavy ballast.

**23.** *See Bunge Corp.,* 558 F.2d at 795.

**24.** *Id.* Rule 3(k) (emphasis added).

radar observation, or to monitor the VHF radio. The Stolt Jade's master and first officer testified that the following safety precautions were taken as the Stolt Jade passed through the fairway: standard navigational lights were operational and turned on; a look-out was stationed on the starboard bridge; two radios were monitored at channel 16 VHF; two radars, at settings of three and six miles, were operational and in use; the ARPA system was employed at a range of 1.5 miles. Both the master and first officer of the Stolt Jade testified credibly and the Court has found no reasonable basis upon which to question their version of the events. Moreover, their use of radar was verified by radar plots appearing at five minute intervals on the Stolt Jade's navigation chart.

The Court is not unmindful of the Gulfwind's argument that the Stolt Jade's admitted failure to see the Gulfwind either on radar or visually is evidence of their neglect. The Court, however, concludes that the Stolt Jade's crew offered a plausible and uncontradicted excuse for its failure to see the Gulfwind on radar, i.e., the Gulfwind's close proximity to Texaco's platform disguised the Gulfwind on the Stolt Jade's radar screen. The Gulfwind also offered no evidence to indicate that the Stolt Jade's lookout was improperly stationed, incompetent, or that changing weather conditions and visibility in the area could not have reasonably prevented the Stolt Jade's lookout from seeing the Gulfwind.[25]

■ As for Gulfwind's contention that the Stolt Jade was improperly positioned on the western half of the fairway, the Court concludes that the Stolt Jade's position and south-easterly course did not present a hazard to navigation. Although it may have been preferable for the Stolt Jade to have positioned itself further to the east, the vessel was under no obligation to do so. The fairway is not a narrow channel, its use is voluntary, and vessels may proceed through the fairway as they see fit. Lastly, the Court notes that this is not an instance when a vessel intending to follow the southeast leg of the fairway into the Gulf positioned itself on the western edge of the fairway. The Stolt Jade's course favored the western half of the fairway, but it remained within close proximity to its center. As noted by the Gulfwind's captain, the center is the preferred position for vessels traveling through the fairway.

The Gulfwind's final contention—the Stolt Jade navigated at an unsafe speed—has some merit, but fails in the end to provide a sufficient basis upon which to impart liability onto the Stolt Jade. It is undisputed that the weather conditions on the night of the collision were poor and visibility was restricted. Under these conditions, the Stolt Jade was required to maintain a speed which would allow her to take evasive action in the event a close-quarters situation developed.[26] According to the Coast Guard, weather conditions were not conducive to normal travel speeds on the night of the collision. Moreover, from the time its pilot disembarked, the Stolt Jade increased its speed full ahead to 12 knots, which took it well beyond the speed in which she is able to effectively maneuver if a close-quarters situation had developed.[27] Thus, under the prevailing conditions, including the restricted visibility, the Stolt Jade's speed was unsafe and constituted a violation of Rules 6 and 19 of the COLREGS. But the question remains whether this violation imparts liability onto the Stolt Jade.

Once a violation of the COLREGS is established, "the burden rests upon the ship of showing not merely that her fault might not have been one of the causes [of the collision], or that it probably was not, but that it could not have been."[28] Although the burden is a heavy one, the Court concludes that the Stolt Jade came forward with sufficient evidence at trial to establish that the collision between the Gulfwind and Texaco's platform was caused solely by the fault of the Gulfwind

25. *See* Deposition of Emmanuel Plofino taken on June 4, 1992.

26. 33 U.S.C. § 1602, Rules 6, 19.

27. *See* Gulfwind Exhibit No. 38.

28. *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874).

and her navigators.[29] Having spotted the Stolt Jade on her radar, the Gulfwind was under an obligation under Rules 19 and 8, to take appropriate affirmative measures to avoid a close-quarters situation. The Gulfwind, however, through the acts and omissions of her captain failed to take any informed or considered steps in compliance with its obligations. In fact, the Gulfwind and its crew demonstrated a blatant disregard for the most fundamental principles of good seamanship by, among other things turning off its ARPA system, failing to plot its course, and failing to maintain proper radio communications. The Stolt Jade's speed could not in any way have contributed to the negligence of the Gulfwind's crew because it was simply too far to the north-east to have posed a threat that would have hindered the decision-making of the Gulfwind's crew. Moreover, under the circumstances of this case, the Stolt Jade was not required under the COLREGS to take any evasive action whatsoever, thus its speed never became a contributing factor to the collision.

## IV. THE FAULT OF THE GULFWIND

As stated previously, due to the restricted visibility in the area, both vessels were under an obligation to comply with Rule 19 of the COLREGS until they were within visual sight of one another at which time section two of the COLREGS governed. Rule 19 requires a vessel which detects a close-quarters situation developing over radar to take avoiding action. Rule 19 further requires all vessels to comply with the rules of section one of the COLREGS with due regard for the prevailing circumstances.

The evidence presented at trial clearly demonstrated that the Gulfwind and her crew acted in total disregard of every applicable provision of the COLREGS. First, it is undisputed that the Gulfwind's Captain failed to post a lookout anywhere on the vessel as it entered the fairway. This constitutes a violation of Rule 5 of the COLREGS, which requires a vessel to maintain a proper lookout by sight and hearing at all times. Secondly, it is undisputed that the Gulfwind turned off its ARPA system despite the crew's knowledge of an oncoming vessel. The testimony of the Gulfwind's Captain and Second Officer further established that the Gulfwind did not conduct any radar plots after 2100 hours even though the Stolt Jade appeared on the Gulfwind's radar screen. Rule 7 of the COLREGS requires a vessel to engage in radar plotting and conduct other systematic observation of vessels. Rule 7 also forbids a vessel from making assumptions on "scanty information, especially scanty radar information." The Gulfwind's failure to effectively use its radar systems in restricted visibility, in violation of Rule 7, left the vessel virtually blind in a fairway commonly used by other vessels and surrounded by oil structures. In short, the Gulfwind and her crew were negligent in failing to abide by section one of the COLREGS as well as Rule 19. The Court will now consider whether their negligence was the proximate and legal cause of the collision between the Gulfwind and Texaco's platform.

From the time the Gulfwind sighted the Stolt Jade on radar to approximately 2112 hours, the Gulfwind had both the time and searoom necessary to avoid the collision. By its own account, at 2100, the Gulfwind altered its course in a fashion that the Captain knew or reasonably should have known would bring the Gulfwind into a crossing situation with the Stolt Jade. The vessel, nevertheless, continued on this course for at least ten minutes bringing the vessels in closer proximity to each other. At any time within this period, the Gulfwind could have come to a dead stop or circled until the Stolt Jade passed. Captain Bazigos, however, ordered the vessel to take a sharp turn to port on a direct collision course with Texaco's platform. For at least the next four minutes, Captain Bazigos could still have ordered his ship to come to a halt or take a radical turn to the right without impeding the Stolt Jade or

---

**29.** To the extent that the Gulfwind agues that she was placed in extremis by the Stolt Jade, the argument is meritless. The circumstances leading up to the collision with Texaco's platform did not present extreme circumstances. The Gulfwind had ample time to make a considered decision as to how she would proceed and failed to do so. Accordingly, the navigational faults of the Gulfwind cannot be excused.

colliding with the platform. Instead, Captain Bazigos allowed the Gulfwind to continue on its collision course with Texaco's platform for the next two minutes. Captain Bazigos then sealed the Gulfwind's fate by turning starboard at full ahead. By the time he realized that the effect of the prevailing weather conditions on the Gulfwind in light ballast were too overwhelming to allow him to compensate for the vessel's position by turning starboard, the vessel was too close to the platform to avoid the collision. The Captain's display of poor seamanship throughout this period constitutes a continuing violation of Rule 8 of the COLREGS and was the proximate and legal cause of the collision.

## V. CONCLUSION

In summary, the Court concludes that the collision between the Gulfwind and Texaco's West Delta 109–A Oil and Gas Platform was caused solely by the Gulfwind without fault on the part of the Stolt Jade or Texaco.[30] The Gulfwind interests' claims against the Stolt Jade and her owner will therefore be dismissed. The only remaining issue to be heard is the amount of damage sustained by the Texaco platform as a result of the collision. Accordingly,

IT IS ORDERED that Seacarriers Maritime Company and Westwind Africa Line Limited claims against the Stolt Jade and Stolt Jade, Inc. be DISMISSED.

IT IS FURTHER ORDERED that there be judgment in favor of Texaco Exploration and Production, Inc. and against M/V Gulfwind, her engines, tackle, apparel, furniture, etc., in rem, Seacarriers Maritime Co., Ltd. and Westwind Africa Line, Limited, in personam on the issue of liability.

The Clerk of Court shall withhold entry of final judgment until the Court issues a ruling with respect to damages.

---

**30.** For the Court to have concluded otherwise would have meant relying on the unreliable testimony of the Gulfwind's master and second mate.